# ACME MARKETS, INC. *v.* DAWSON ENTERPRISES, INC.

[No. 156, September Term, 1968.]

*Decided April 3, 1969.*

*Motion for rehearing filed May 2, 1969; denied May 26, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN and SMITH, JJ.

*James S. McAuliffe, Jr.* and *J. Cookman Boyd, Jr.,* with whom was *Harry E. Silverwood, Jr.* on the brief, for appellant.

*Arthur J. Hilland,* with whom was *Charles Duvall Smith* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Dawson [1] insists Acme's [2] lease is a cloud on its title. The trial judge, Shure, J., agreed. We take a different view. The facts, on the whole, are undisputed.

In 1957 Dawson was, and still is, the owner of a 26.3 acre tract in Montgomery County on the west side of Wisconsin Avenue, immediately south of Rockville. It contemplated the development of the land, already dubbed "Hungerford Mart," as a shopping center and, as a starter, solicited Acme to lease the supermarket area. The first formal proposal, in which the area was said to be 35 acres, was contained in a letter dated 13 September 1957. This was followed by a revised proposal dated 11 October 1957. In the third and final proposal, dated 17 January 1958, Dawson offered to build and lease to Acme a supermarket containing approximately 28,000 square feet and a parking area. On 6 May 1958, after about six months of discussion and negotiation, Dawson and Acme executed a lease, recorded 13 May 1958, reciting a consideration of "One Dollar ($1.00) and other valuable consideration paid and to be paid," granting to Acme "all that certain tract of ground with a store building and parking area to be constructed thereon" by Dawson, in "Hungerford Shopping Plaza * * * and more specif-

---

1. Dawson Enterprises, Inc., a Maryland corporation, appellee.
2. Acme Markets, Inc., a Delaware corporation, appellant. In May 1958 it was called American Stores Company.

ically described in Exhibit A attached hereto * * * for an initial term of fifteen years from" 1 May 1959. Attached to the lease and recorded therewith are the metes and bounds descriptions (furnished by Dawson) of a 9.3735 acre parcel and a 16.9685 acre parcel (total 26.3420 acres). The lease also contains a covenant "running with the land" restricting Dawson from leasing to any other store "for the sale or storage of food." Reference is made, in the recorded lease, to further provisions contained in an "Agreement of Lease," also known as the "Indenture of Lease," bearing the same date. The cost of recording the lease, including the recording tax, was $986.50, all of which was borne by Acme.

The "Agreement of Lease" is an elaborate document. Some of its pertinent provisions are as follows:

> "The term of this lease shall be for a period of 15 years, commencing the First day of May, 1959, on which date the Landlord covenants that the said premises shall be ready for occupancy in accordance with the terms of this lease.
>
> * * *
>
> "Landlord agrees to act with due diligence to have the building and parking lot completed on time, provided however, that if for any reason whatsoever the same are not completed by November 30 1959, and ready for occupancy under the terms hereof, *Tenant at its sole discretion shall have the right to elect to terminate* this lease and if so terminated and upon repayment to Tenant by Landlord of any rent paid in advance, this lease shall be null and void and there shall be no further rights in or obligations on the parties hereto. [Emphasis added.]
>
> "At the expiration of the original term of this lease, Tenant shall have the right or option to renew this lease for four additional terms of five years each * * *.
>
> * * *
>
> "It is further understood and agreed that the herein demised premises shall not be construed as ready and fit for acceptance and occupancy by Tenant until all

the work and improvements called for herein have been entirely completed in a manner satisfactory to Tenant nor until all tools, scaffolding, rubbish and building materials of every kind and character have been removed from in and about said premises, and in addition, until Tenant is furnished proof of all approved certificates of inspection as may be required by any law or any lawful authority which will in any way affect Tenant's taking occupancy of and the conducting of its business in and/or on said premises, and until 75% of the first 77,000 square feet of building are completed and leased (including a drug store similar to Peoples', Sun Ray or Drug Fair, and a variety store similar to Woolworth's or Kresge's) and ready to open for business simultaneously with Tenant's store."

Dawson's efforts to make a go of Hungerford Shopping Plaza were monumentally unsuccessful. Acme's lease was the only one it was ever able to conclude. Dawson assigns most of its misfortune in this regard to the fact that another shopping center, Congressional Plaza, a mile and a half to the south, was able to get itself "off the ground" while Dawson was negotiating with Acme. Donald Gingery, the executive vice president of Dawson, testified that Congressional Plaza "had a vacant Giant Food store that * * * [had been] built and * * * [had been] vacant for two and a half years." Gingery said he very nearly had Peoples Drug Stores signed up but "almost simultaneous to that time, within a matter of days, Congressional Plaza got off the ground and Peoples decided to go ahead with * * * Congressional Plaza and would not lease from us." Neither, it seems, would any other business. Gingery gave as another reason for Dawson's failure to obtain other tenants that "there was just too darn much" C-2 (heavy commercial) land in the neighborhood. An odd facet of the case is that although Dawson represented to Acme in September 1957 that the land was zoned C-2, only the 9.3735 acre tract was so zoned. The 16.9685 acre parcel was zoned R-60, and that is its present classification.

Nevertheless, Dawson, assisted from time to time by Acme, continued its search for tenants. Gingery said the final effort was made in 1968. In a letter dated 19 June 1963 Dawson ad-

vised Acme of its inability to comply with all of the terms of the lease. Earlier discussions with Mr. Haller of Acme's real estate department were mentioned and a meeting with other representatives of Acme was solicited. Dawson said it supposed Acme was aware of the fact that "some of the land * * * conveyed by this lease is *not even zoned commercial.*" (Emphasis added.) During the following 11 months it appears that a number of meetings and discussions concerning the erection of a smaller store took place. Plans and specifications were developed and bids were received in March 1964. In a letter dated 26 June 1964 Dawson informed Acme that the smaller store (18,500 square feet) would require a guaranteed minimum rent of $66,600 per annum. (The lease called for 28,000 square feet for a minimum of $44,584.) Dawson went on to say:

> "The store originally anticipated for this center, on which a lease was made, cannot now be built and rented to you because of costs and many other factors. As a matter of fact, we question the advisability of a shopping center in this location considering the development that has occurred in one and five-eighths of a mile south on the Rockville Pike. *There are in existence at the present time on the Rockville Pike, seven supermarkets, all fairly large, which would indicate to us that a supermarket in our location might have tough sledding.*
>
> "We suggest that *the existing lease* on the above property *be cancelled* and we will give American Stores Company the *right of first refusal* for three years in the event a supermarket is to be built there." (Emphasis added.)

Two more years passed, during which, as earlier mentioned, efforts were being made to find other prospective lessees. In a letter dated 10 October 1966 counsel for Dawson advised Acme that it "is not in a position to renegotiate the lease because it is not in a position to build a shopping center and *intends to sell the land involved.*" (Emphasis added.) The letter, in pertinent part, continues:

> "Both Mr. Haller and Mr. Parkhill suggested that

if the lease of May 6, 1958, is to be cancelled, Acme * * * would want an option running with the land to lease any food store that might be constructed on the land involved. In our opinion, such an option would cloud the title just as the short form of the lease which has been recorded clouds the title now and would constitute the same burden on a sale of the land as the recorded short form of the lease constitutes.

* * *

"* * * we have advised Dawson * * * to enter into the enclosed agreement of cancellation with Acme * * *. We have also advised Dawson * * * that the only other way to remove the cloud from the title is a lawsuit to obtain a judgment declaring that the lease of May 6, 1958 never became effective, or, if it did, is no longer of any force and effect.

* * *

"* * * Moreover, if Dawson * * * were able to and did at this late date build a shopping center, * * * it could not compel Acme * * * to accept possession and pay rent under the lease of May 6, 1958. We understand that Acme * * * does not now want the large store called for by the lease. * * * we also think that any remedy that Acme * * * might have had, * * * is now barred by the lapse of time."

Within ten days Acme's general counsel replied. He expressed general disagreement with the substance of the letter of Dawson's counsel. "To avoid any possible misunderstanding," he wrote, "Acme is, at the present time, willing to accept possession and pay rent in accordance with the existing terms and conditions of the lease." He declared there was no "firm basis" for the understanding that Acme does not now want the large store called for by the lease. He expressed also a willingness to "discuss any possible reasonable and justifiable renegotiation of the lease." And it might be noted that Acme reiterated, at argument in this Court, its willingness to accept possession and pay rent, *even if there are no other stores doing business on the property*. There was testimony that Acme spent $3,000 in the preparation of plans and specifications.

Dawson's bill of complaint was filed in the Circuit Court for Montgomery County on 11 September 1967. It alleged, among other things, that "it was contemplated by the parties to this lease, and an implied term thereof, that if the plaintiff, exercising good faith and acting with due diligence, was unable to secure the required tenants by a date sufficiently in advance of November 30, 1959 to permit the construction of the store and parking lot, then also the lease would be null and void, and there would be no further rights in, or obligations on, the parties thereto."

The case came on for trial before Judge Shure on 18 April 1968. In his opinion, filed 27 May 1968, he stated that Acme had "been aware from the outset that * * * [Dawson had] made diligent efforts to put together a shopping center without success, and that pessimism continued as late as the Fall of 1966." After 30 November 1959, he continued, Acme "without 'any reason whatsoever' had the right to elect to terminate the lease, but now, after a lapse of more than ten years it defends by saying it has not cancelled and does not intend to." The learned chancellor, we think, has misread the lease. It provides "that if for any reason whatsoever" Dawson fails to complete the building and parking lot by 30 November 1959, then and only for that reason does Acme "at its sole discretion * * * have the right to elect to terminate" the lease. The court goes on to say:

> "Since the building has not been completed, certainly specific performance could not be granted to either party under this Lease. No action at Law could be maintained under said instrument, since there is no evidence from any source that the landlord acted other than with due diligence in attempting to obtain the necessary occupancy leases in order that buildings could be erected.
>
> "The Lease herein involved was prepared by the Acme Stores, Inc. and is on their printed form with typewritten insertions to make it applicable to the subject situation. It is fundamental that language prepared and included by one party to a contract is to be con-

strued against that party if ambiguous; and where one in selling land admittedly prepared and inserted clauses in the contract, such clauses must be construed against the seller (*Cadem v. Nanna,* 243 Md. 536). It is also fundamental that a contract giving one party an option to terminate it at will or on reasonable notice, will be construed as giving the other party the same right in the absence of a provision in the contract to the contrary. (*Foster Porter v. DeMare,* 198 Md. 20; and 5 M.L.E. Pg. 474). Such a construction would appear reasonable in other contracts if it does not defeat its purpose or nullify default provisions."

The court's order declared the recorded lease "to be unenforceable and therefore a cloud upon the title."

## I.

In its brief Dawson contends first that the lease was "a mere agreement for a lease" to become "effective and operative in the future, only when and if certain *conditions precedent* were fulfilled within the time limit" therein fixed. (Emphasis added.) We have not found in the evidence anything to support such a contention. Dawson argues that its proposal of 17 January 1958 was to "build and lease" to Acme *"upon* the following *conditions."* (Emphasis added.) The precise language of the proposal is "[w]e submit herewith our formal proposal to build and lease * * * *according* to the following conditions and specifications *categorically* set up hereunder." (Emphasis added.) Dawson insists that two of the "conditions" were as follows:

"The Landlord agrees to build and open simultaneously with the building and opening of American Stores 75 per cent of total area of the shopping center as shown on Exhibit A, exclusive of restaurant.

"The above rental is based on the assumption that the owner secures a 20 year loan commitment which has been verbally given by the mortgagee subject to inspection of the lease papers."

Certainly one must stretch one's imagination to view these as "conditions." It seems to us that Dawson, having announced

earlier in the proposal its intention to build a store for Acme, is simply saying, as an additional inducement to Acme to become a tenant, that it will build and open 75% of the shopping center at the same time Acme opens for business. The second "condition" appears to be merely an explanation of how the amount of the proposed rent was determined.

We have examined carefully both the recorded lease and the agreement of lease but we have found therein nothing which looks to us like a condition precedent. Both provide explicitly and precisely that the term "shall be for a period of 15 years, *commencing on the First day of May 1959.*" (Emphasis added.) This is also the day on which Dawson convenanted to have the store ready for occupancy. There are, of course, provisions establishing the date when Acme must begin to pay rent but there can be little doubt that the lease became effective as a lease on 6 May 1958 for a term of 15 years beginning 1 May 1959. It will be recalled that Dawson actually had until 30 November to have the improvements ready for occupancy.

Had Dawson intended the lease to become "effective and operative" only upon the condition or contingency that it would succeed in obtaining lessees for 75% of the first 77,000 square feet of building it would have been quite easy to have said so. After all Gingery, by his own admission, was both knowledgeable and experienced in building and developing, besides having served on the National Capital Regional Planning Commission for 11 years and the Board of Zoning Appeals for Montgomery County for 15 years. Indeed, one is conscious of a gnawing suspicion that it was part of Dawson's strategy to get Acme firmly on the hook so it could be used as bait for others.

The cases cited by Dawson, on the whole, seem to us to be inapposite. For an informative discussion of leases resembling the lease under consideration see the opinion by Chief Judge Hammond, for the Court, in *Motels of Maryland, Inc. v. Baltimore Co.*, 244 Md. 306, 223 A. 2d 609 (1966).

## II.

Dawson next contends that even if the lease did become "effective and operative" the provision giving Acme the right to elect to terminate the lease because the improvements were not

completed by 30 November 1959 must be construed as giving it the same right. Dawson argues that there is nothing in the agreement to indicate that it did not have the same right as long as it "acted with due diligence." Moreover, it says, echoing the opinion of the chancellor, since Acme prepared the contract the "ambiguity" must be construed against Acme.

The exclusivity of Acme's right to elect to terminate the lease for Dawson's failure to complete the improvements could scarcely have been made more clear by the use of the English language, and while there may be nothing in the lease indicating Dawson does *not* have a like right it is quite clear there is nothing there indicating Dawson *does have* such a right. Contracts in which one party may terminate upon the happening or non-happening of an event have been held to be valid where both parties were bound for a period of time. In the case at bar Acme was wholly bound under the lease until 30 November 1959 and it would thereafter have continued to be bound if Dawson by that time had managed to have the premises ready for occupancy. We think the principles of law applicable here have adequately been stated by Professor Corbin:

> "When a contract is entered into, a power of termination may be expressly reserved to either party or to each of them. * * * If there are * * * conditions specified, the power to terminate is a conditional power. [Footnote — If the privilege and power of termination by notice are reserved in a contract, on condition of some breach of duty by the other party, the occurrence of such a breach is a condition precedent to the privilege.] One who asserts his discharge by reason of the exercise of such a power must show the fulfillment of the condition—the existence or occurrence of the fact or event constituting the condition."
>
> * * *
>
> "A power may be reserved to one party to terminate the contract if the other party fails to render specified performances or to produce certain results. [Footnote —Such a provision gives no power to the other party to terminate his contract duty by failing to perform it.]

Here, the failure of the other party is a condition precedent to the existence of the power."

* * *

"The reservation of such a power to terminate does not invalidate the contract or render the consideration for a promise insufficient, so long as the party reserving the power to terminate is irrevocably bound for any appreciable period of time or has materially changed any of his legal relations or otherwise rendered some performance capable of operating as a consideration." 6 A. Corbin, *Contracts* § 1266 (1962).

"Leases * * * sometimes expressly provide that one of the parties shall have the power of termination. The provision creating a power to terminate is not itself a contract; it is merely a subsidiary (but important) provision in a contract with a different name and made for a different purpose. The 'option to terminate' does, indeed, give to a party a choice between terminating and not terminating * * *."

* * *

"A contract is not made invalid for lack of 'mutuality' by the fact that one of the parties and not the other is given the option of terminating the contract on some condition, such for example as the failure of the other party to render satisfactory performance." 1A A. Corbin, *Contracts* § 265 (1963).

*See also Mayor & City Council v. Industrial Electronics, Inc.,* 230 Md. 224, 229, 186 A. 2d 469 (1962) ; *Palladi Realty Co. v. Ohlinger,* 190 Md. 303, 310, 58 A. 2d 125 (1948) ; *Geiger v. Western Maryland R.R. Co.,* 41 Md. 4, 12-13 (1874) ; 1 S. Williston, *Contracts* § 105A (3d ed. 1957).

Dawson relies heavily, as did the chancellor exclusively, upon *Foster-Porter Enterprises, Inc. v. DeMare,* 198 Md. 20, 81 A. 2d 325 (1951), but that case involved a contract for personal services. Dawson quotes from the opinion of Judge Markell (later Chief Judge) who spoke for the Court:

"If the exclusive agent or distributor may terminate his relations with the principal at will or upon reason-

able notice, the contract should be construed as giving the principal the same right *in the absence of provision to the contrary.*" (Emphasis added.) *Id.* at 32.

Dawson apparently has overlooked the significance of the words "in the absence of provision to the contrary." As we have said, there is a "provision to the contrary" here. Acme was given the right to terminate; Dawson was not given a reciprocal right. But this is not to say that Dawson was not given the option to terminate the lease for other reasons. As a matter of fact, Dawson had the "option of cancelling the lease" if Acme elected "to close the store;" it had the option also to declare the lease void for non-payment of rent. Conspicuously absent, however, is any option or right to elect to terminate the lease for its own failure to perform the covenant to complete the improvements by 30 November 1959 or at all.

In *Kahn v. Janowski,* 191 Md. 279, 285-86, 60 A. 2d 519 (1948), in which a contract for the sale of land was involved, it was said:

"* * * It is an accepted rule that where parties are competent to contract, neither party can be relieved from his promises merely because he did not use good business judgment or because the contract was not as profitable as expected, in the absence of fraud, undue influence or mistake in making the agreement. *Poe v. Ulrey,* 233 Ill. 56, 84 N. E. 46; *Lea v. Blokland,* 122 Or. 230, 257 P. 801. Generally the parties to a contract may provide that it may be rescinded at the option of either party, and may fix the rights and liabilities of each in the event of such rescission. * * * Where the right to terminate a contract is reserved in the instrument itself, in the absence of fraud, undue influence, or mistake, such reservation is valid and will be enforced, if not contrary to equity and good conscience."

Although an option to terminate may be unilateral and appear to lack mutuality, it has been held that if the provisions are quite clear as to one party's option a court cannot be ex-

pected to relieve the other party of the consequences thereof because the bargain as to him was improvident, rash, foolish or oppressive. *Ace Flying Service, Inc. v. Colorado Dep't of Agriculture,* 141 Colo. 467, 348 P. 2d 962 (1960). *See also Standard Oil Co. v. Veland,* 207 Iowa 1340, 1344, 224 N. W. 467, 469 (1929) ; *Soltesz v. Carter,* 87 N.E.2d 599, 600 (Ohio 1949).

There is an utter lack of persuasiveness in the argument that the lease must be construed against Acme because it was prepared by Acme. The facts are that it was prepared by Acme after three proposals had been received from Dawson, that it was mailed to Dawson on or about 14 February 1958, that it was in Dawson's possession for at least 60 days before it was executed by Dawson, that Dawson's president, Walter W. Dawson, was a member of the bar, that Dawson's executive vice president, Gingery, had wide experience and considerable expertise in such matters, and that a member of a prominent Washington law firm had been designated in the third proposal as Dawson's attorney. In *Rossi v. Douglas,* 203 Md. 190, 198, 100 A. 2d 3 (1953), it was said that the "rule that doubtful language is to be interpreted against the party who drafted the instrument is only a secondary rule of construction and perhaps should have but slight force in a situation where both parties are represented by counsel." Dawson, significantly, does not deny that it had the advice of counsel in this regard; it says merely that there is no evidence to that effect. Dawson may not have needed any advice but we have no doubt that it was at all times ready at hand. In any event the rule is applicable only if the language to be construed is ambiguous; no ambiguity has been pointed out to us nor have we discovered any.

### III.

In the bill of complaint and throughout the testimony we note the use of the expression "impossibility of performance." The chancellor also, in his opinion, makes oblique reference to that concept. We shall not undertake a discussion of that particular area of the law because, in the present posture of the case, performance does not seem to us to be impossible. It may be inconvenient; it may be profitless; it may and very likely would be expensive; but it is not impossible. Dawson needs only to

build the store and the parking area to require Acme to take possession and pay rent and Acme has committed itself to do just that. *See State v. Dashiell,* 195 Md. 677, 689, 75 A. 2d 348 (1950); *Ryan v. Brown Motors, Inc.,* 132 N.J.L. 154, 39 A. 2d 70, 72-73 (1944); *Cushman v. Outwater,* 121 Vt. 426, 433, 159 A. 2d 89, 94 (1960).

It has been suggested that perhaps the doctrine of commercial frustration is applicable here, but this too must be dismissed. In *Maryland Trust Co. v. Tulip Realty Co.,* 220 Md. 399, 416, 153 A. 2d 275 (1959), we said that generally "with respect to leases, the doctrine of frustration has been limited to cases of extreme hardship." In *Montauk Corp. v. Seeds,* 215 Md. 491, 499-500, 138 A. 2d 907 (1958), Judge Prescott, later Chief Judge, said, for the Court:

> "The general principle underlying commercial frustration is that where the purpose of a contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance, the contract will be discharged. The courts in determining whether frustration will apply usually look to three factors. The first and probably most important is whether the intervening act was *reasonably foreseeable* so that the parties could and should have protected themselves by the terms of their contract. The courts then must consider the questions of whether the act was an exercise of sovereign power or *vis major,* and whether the parties were instrumental in bringing about the intervening event. The courts have generally held that if the supervening event was reasonably foreseeable the parties may not set up the defense of frustration as an excuse for non-performance. The majority of the courts stress this principle in deciding cases on frustration, and hold that if the parties could have reasonably anticipated the event, they are obliged to make provisions in their contract protecting themselves against it. 18 University of Cincinnati L. Rev. 536; cf. *State v. Dashiell,* 195 Md. 677, 689, 75 A. 2d 348."

Gingery's testimony makes it entirely clear that he was not only intimately familiar with the Rockville area but that he was acutely aware of the status of Congressional Plaza. And he was especially and peculiarly knowledgeable about the perils and uncertainties of zoning. It is not much less than incredible that Dawson did not insist upon the insertion in the lease of an avenue of escape in the event things went sour. "Generally speaking, the courts have been careful not to find commercial frustration if it would only result in allowing a party to withdraw from a poor bargain." *Perry v. Champlain Oil Co.,* 101 N.H. 97, 98, 134 A. 2d 65, 67 (1957).

## IV.

Dawson argues, as the chancellor found, that neither it nor Acme could have obtained the specific enforcement of the lease and, inferentially, that this justifies the chancellor's order declaring it to be unenforceable and a cloud on the title. Of course, the practical effect of the order is to terminate the lease since the order also requires Acme to "release said Lease from said Land Records." We do not understand it to be the law that a party to a contract loses all of his rights thereunder simply because a court for one reason or another may or might have declined his petition to enforce it specifically. *Brooks v. Towson Realty, Inc.,* 223 Md. 61, 73-74, 162 A. 2d 431 (1960) ; *Standard Am. Homes, Inc. v. Pasadena Bldg. Co.,* 218 Md. 619, 627-28, 147 A. 2d 729 (1959). Moreover, neither Acme nor Dawson has asked for the specific performance of the lease and we shall not, at this time, venture to say that Acme could not adopt a posture which would entitle it to a decree requiring Dawson to allow the completion of the improvements with Acme's money and the recapture of the money by Acme out of the rentals. *See Motels of Maryland, Inc. v. Baltimore Co., supra.* It is possible also that Acme, denied specific performance, might have claims which it could assert successfully against Dawson in an action at law.

## V.

The only remaining contention of Dawson which we think calls for comment is that somehow Acme is barred by the Stat-

ute of Limitations from asserting any interest in the property under its lease. It will be recalled that the years 1957 through 1966 were not a period of inaction. Dawson continued, with such assistance as Acme was able to give, its efforts to find tenants. There were extended discussions about a smaller store. Plans were formulated and bids were taken. Never was there a suggestion that the lease was invalid or nonexistent. As late as October 1966 Dawson recognized the existence of the lease and sought its cancellation and, for the first time, served notice on Acme that, since it intended "to sell the land," it had withdrawn the offer made earlier to give Acme, in exchange for the cancellation of the lease, "an option running with the land" because, it said, "an option would cloud the title just as" the lease would. In short the deal had soured and Dawson wanted to chuck it. Acme's lease was indeed a "cloud" but it was a cloud which Dawson had itself created. Acme is not in default and if, at the same time, it is being a little hard-nosed we cannot say it is without justification. After all its lease denies access to the property by its competitors and perhaps this is reason enough to want to hold on.

The following quotation from *Cunningham v. Davidoff*, 187 Md. 134, 137-38, 46 A. 2d 633 (1946), is, we think, sufficiently appropriate to justify its inclusion in this opinion and, without further comment, we have set it out below:

> "However, while it has long been established that a suit to foreclose a mortgage may be barred either by presumption of payment or by a statute of limitations, it is also well settled that when a mortgagor seeks affimative relief in a suit to quiet title, the sole allegation that the mortgage is barred by limitations is not sufficient. The presumption of payment or *a statute of limitations may be used as a shield, but not as a sword*. Equity considers that the moral obligation to pay a just debt continues after the lapse of the limitation period. The maxim, 'He who seeks equity must do equity,' applies in such case with full effect. A mortgagor who comes into a court of equity asking for cancellation of a lien upon his property will be required

to respect the maxim regardless of a statute of limitations. So, where the only ground advanced by a mortgagor for relief is that the mortgage is barred by limitations, the court will not interpose its aid. [Citing cases.] Accordingly, in *Cacy v. Slay,* 127 Md. 493, 498, 96 A. 690, 1 A.L.R. 764, Chief Judge Boyd stated that when a mortgagor comes into a court of equity to compel release of the mortgage, 'he must not only allege * * * but must prove that the mortgage has been paid, or at least that he is entitled to have it released by those he proceeds against.'

"However, the court will not apply the maxim where there is no moral obligation on the mortgagor or his successor in interest to pay the debt which the mortgage was given to secure." (Emphasis added.)

For all that has been said the decree of the learned chancellor must be reversed.

*Decree reversed.*
*Costs to be paid by the appellee.*