YARNICK *v.* KING ET UX.

[No. 28, September Term, 1970.]

*Decided October 15, 1970.*

The cause was argued before HAMMOND, C. J., and MC-WILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Harvey Rosenberg* for appellant.

*Daniel B. Wiegers* and *Alfred W. Spates* for appellees.

SINGLEY, J., delivered the opinion of the Court.

While the record gives us little help on this point, it would seem that in 1961 Mr. and Mrs. King, who were the owners of a 550-acre farm bounded by Maryland Routes 117, 118 and 119 in Germantown, in Montgomery County, entered into some sort of arrangement with Yarnick looking toward a development of the tract as "Kingsview Knolls." Things never seemed to have gone entirely smoothly and by July, 1964, the parties entered into a written agreement (the 1964 Agreement), intended to cover Yarnick's failure to pay for 44 lots which had been conveyed by the Kings. The 1964 Agreement was supplemented by a second agreement in January, 1966 (the Supplemental Agreement), because Yarnick was again in arrears in his performance. The project foundered a year later when, according to Yarnick, the Kings refused to convey title to 18 lots to which he says he was entitled under the Supplemental Agreement. In October of 1967, Yarnick brought suit in equity in the Circuit Court for Montgomery County, seeking a declaration of his rights, injunctive relief, and damages. At the instance of the Kings, Yarnick's associates, who by that time had acquired by assignment all but 9% of Yarnick's interest under the agreements, were joined as additional parties plaintiff. From a decree denying relief on the premise that the agreement, as supplemented, was unenforceable because it lacked specificity and had been breached, Yarnick and his associates have appealed. The thrust of their

argument is that it was error for the chancellor to declare the agreement unenforceable, or alternatively, if it was unenforceable, that it was error not to award damages.

As is true in many of the cases involving real estate that come to us from the more populous sections of the State, this one is heavily overlaid with a zoning problem, but before we can address ourselves to this aspect, it is necessary to summarize the factual background of the controversy. Whatever the situation may have been at first, it is clear that by 1964, Yarnick was in arrears in his commitment to pay the Kings $88,000 for 44 lots and owed the Kings $50,000 for road construction. To compensate for this, the 1964 Agreement provided that the purchase price of lots thereafter to be acquired by Yarnick, fixed by the 1964 Agreement at $2,000 for each residential lot containing 20,000 square feet or less, would be increased by $1,200 until the entire sum of $50,000 had been repaid; that interest at the rate of 6% would be paid on the original purchase price and the additional purchase price; and that a premium of $500, without interest, would arbitrarily be added to the purchase price of each of the lots. It was also agreed that Yarnick would purchase 25 lots before 31 January 1965 and 25 lots in each year thereafter until all of the residential lots had been sold. If Yarnick failed to do so, or if at any time there was an accumulation of more than 65 lots which Yarnick was obligated to buy, the Kings, at their option, could cancel the agreement.

There were other significant provisions of the 1964 Agreement:

"1. (a) Lots * * * shall be platted and recorded in groups consisting of not less than 10 lots at any one time.

(b) The land to be so subdivided shall be chosen jointly by the parties hereto."

* * *

"(e) The $2,000.00 sales price applies only to

residential lots containing 20,000 sq. ft. or less, any larger residential lots to be at a sales price of $ .10 per sq. ft. All costs of transfer except Federal Stamps is to be paid by the Builder-Developer."

\* \* \*

"6. \* \* \* All tracts of land mentioned in this Agreement will be developed according to the Preliminary Master Plan previously prepared by Seeley-Martin Associates, except that Paragraph 8 below shall take precedence over the Master Plan if it conflicts. A copy of this Master Plan to be a part of contract."

\* \* \*

"8. The land, designated on the preliminary plan attached hereto and made a part hereof, as commercial and apartment shall be either sold or developed in accordance with the zoning thereof in the following manner:

(a) The land, the whole or any part thereof shall be sold or retained at the option of the Builder. All apartment zoning and/or development shall be to the East side of the new location of Maryland Route #118.

(b) If the land is sold, the price shall be determined by Three (3) qualified appraisers, one to be chosen by the Builder-Developer, and one by the Owner and the third one by the other two. And the Owner shall receive one-half of the net proceeds, thereof in addition to the payment provided in Paragraph 8 (d) following, and the Builder shall receive the other half. The property shall not be sold for less than the appraised value unless the Owner and the Builder agrees to sell for less. This paragraph shall apply in the case of a sale of either all or any part of the said zoned lands.

(c) If the Builder should decide to develop and build commercial and retain for lease and investment or build apartments for rent or investment, the Owner shall take one-half of the appraised value as above determined of the land to be developed.

(d) If the land is zoned as aforesaid, notwithstanding Item 8 (a), (b) and (c) hereof, the owner shall receive minimum payment for the land at the rate of $ .20 per sq. ft. for the commercial ground and $ .15 per sq. ft. for the apartment ground; that is to say that if the zoned property is sold as provided in Item 8 (b) the Owner shall receive the first $ .20 per sq. ft. of the sales price on the commercial and $ .15 per sq. ft. on the apartment ground, and everything over and above that shall be divided equally between the Owner and the Builder. If the land is developed as provided in Item 8 (c), the Owner shall receive Payment in cash for the land at the above rates."

By January, 1966, Yarnick had taken title to only 12 of the 50 lots he was obligated by that time to buy under the 1964 Agreement. According to Yarnick's testimony, he attempted to deliver a check for $19,010 to Mr. King in the midst of a blizzard. King refused, saying that the amount was insufficient, but finally accepted a check for $47,952, presumably at the rate of $3,700 per lot, with interest. This transaction would appear to have given rise to the Supplemental Agreement. This provided, in pertinent part:

"WITNESSETH: As of January 31, 1966 after the taking and payment for Twelve (12) lots at $3,700.00 each in conformity with Paragraph 12 of the Contract between the Parties hereto and or their predecessors in interest

> There will be due to be taken and paid for before January 31, 1967:
>
> Eleven (11) lots at $3,700.00 each in conformity with said Paragraph 12 aforesaid, and
>
> Seven (7) lots at $2,500.00 each in conformity with Paragraph 12 aforesaid
>
> These Eighteen (18) lots to be taken and settled for on or before January 31, 1967.
>
> This taking would comply with the terms of the Contract aforesaid."

In May of 1966, counsel for Yarnick and his associates submitted to the Kings a plat of Section I of Kingsview Knolls, prepared by Mott-Hayden Associates in April of that year, which divided approximately 150 acres of the Kings' property into 86 lots lying to the east of Maryland Route 118 and to the south of Maryland Route 117. The letter transmitting the plat went on to state that Kingsview Knolls Development Company, Inc. proposed to acquire, within 60 days, lots 1 through 11 and 20 through 26 as shown on the Mott-Hayden plat for $58,200 plus interest, which amount was stated to have been deposited in escrow with the law firm.

Despite repeated demands, the Kings refused to convey the lots. The Kings, on the one hand, contended that Yarnick had caused to be platted as residential lots land which should have been reserved at least in part for high-rise apartments, because the lots selected were abutting the intersection of Routes 118 and 117, an area that had been recommended for development as an R-H (multiple-family, high-rise planned residential) zone in the Master Plan for Germantown, which ultimately was adopted by the Montgomery County Council on 27 January 1967. On the other hand, Yarnick and his associates took the position that the area was still zoned R-R (rural residential, minimum lot size 20,000 square feet) and that since individual septic tanks would no longer be permitted in the development, they had selected those lots which had ready access to public sewers.

It will be recalled that the 1964 Agreement provided that the tract would be developed in accordance with a preliminary master plan prepared by Seeley-Martin Associates, which was incorporated by reference. Curiously enough, the master plan is not attached to the original of the 1964 Agreement, although the Agreement had been recorded in the Montgomery County Land Records and was offered in evidence below. The transcript would seem to indicate that the Seeley-Martin plan was marked for identification at the trial below, but was never offered in evidence. Some significance, too, may be attached to the provisions of the 1964 Agreement, which spelled out a technique for commercial development and stipulated that all apartment development should be on the east side of Maryland Route 118.

Two further complications developed during the trial. Without fixing a date, Mr. King testified that he had joined with Yarnick in seeking R-H zoning for that part of the tract which abutted the intersection of Routes 117 and 118, and that he had not learned until the day of the hearing below that the requested reclassification had been denied.

King also testified that upon receipt of the letter demanding conveyance of lots 1 through 11 and 20 through 26, he had remonstrated with Yarnick that the use of that area for residential development was not in the best interest of either of them and not in accordance with the general scheme. As King tells it:

> "I said, 'I don't think it is fair to you or either one of us to let them go at this time on residential.' I said, 'We have about four hundred other acres of ground. You can take any of them that you want to but at this time we will have to not take those,' and that was discussed; and he told me that he told the rest of them that he knew it wouldn't work, and it was wrong. He wanted to go elsewhere. That was the words he told me."

As an alternative, King had offered to convey 18 lots farther south from the intersection, which could be as readily sewered.

Yarnick conceded on redirect examination by his own counsel that these lots had been offered to him by King, were acceptable to him at the time they were offered, and were still acceptable to him at time of trial:

> "Q Due to this recent development, I just have one question, Your Honor.
>
> Mr. Yarnick, referring to Plaintiffs' Exhibit No. 4, do you see the red lines on this plat?
>
> "A Yes, sir.
>
> "Q Did you hear Mr. King testify that you could have the eighteen lots behind that?
>
> "A Yes, sir.
>
> "Q Had he ever offered you that before?
>
> "A Yes, sir.
>
> "Q Would you have wanted it then?
>
> "A Yes, sir.
>
> "Q Are you ready, willing and able to pay for it?
>
> "A Yes. This is sewerable ground."

This selection was the land to be "jointly chosen" as contemplated by Paragraph 1 (b) of the 1964 Agreement. However, it would seem that King's proposal, although acceptable to Yarnick, was not acceptable to his associates, who sometime prior to trial, had acquired by assignments a 91% interest in Yarnick's agreement with the Kings, and continued to press for the lots originally selected.

We cannot say that the chancellor erred when he dismissed the bill of complaint, although we do not agree with his reason for doing so. We think that the bill should have been dismissed because the contract was breached when Yarnick and his associates failed to acquire before 31 January 1967 the 18 lots offered by King which were acceptable to Yarnick. Additionally, each of the 18 lots selected by Yarnick's associates had an area of more than 20,000 square feet, and in the aggregate, according to the

Kings, contained 482,644 square feet. As we see it, the purchase price, provided for by Paragraph 1 (e) of the 1964 Agreement, as modified by the Supplemental Agreement, should have been:

| Purchase Price under Paragraph 1 (e) | 482,644 sq.ft. at 10¢/sq.ft. | $48,264.40 |
|---|---|---|
| Additional Purchase Price under the | 11 lots at $1,700 | 18,700.00 |
| Supplemental | 7 lots at $500 | 3,500.00 |
| Agreement | | $70,464.40 |

together with interest on the purchase price of $48,264.40 and on the additional purchase price of $13,200 (11 lots at $1,200 each). The "$58,200 plus interest" which was alleged, but not proved, to have been placed in escrow was not only not a cash tender, but it was not a price computed in the manner called for by the agreement; nor was it, as the appellants said in their bill of complaint, "a ministerial mistake * * * easily corrected at the time of settlement." While King computed the price differently and decided that $58,200 was "about $21,000 short" there was no reason for the Kings to accept $58,200. Even had Yarnick been entitled to acquire the 18 lots selected by his associates, his failure to perform the contract according to its terms before the 31 January 1967 deadline justified the Kings' termination of the agreement. "A power to terminate in case performance is not satisfactory may be expressly reserved without invalidating the contract, whether the satisfactoriness is to be determined by a party to the contract, by his engineer, or by a stranger." 6 Corbin On Contracts § 1266 (1962) at 60; see also Acme Markets, Inc. v. Dawson Enterprises, Inc., 253 Md. 76, 88, 251 A. 2d 839 (1969).

As far as damages are concerned, there is no evidence other than Yarnick's bald assertion that he had spent $400,000 in developing the property. Presumably this amount had been spent to put some 49 other lots, which he had sold, or on which he had built, in marketable con-

dition. While the record leaves a great deal to be desired on this point, it is apparent that Yarnick must have retained the proceeds from the sale of at least 44 of the lots, since King testified that he had never been paid for them. The record sets forth no basis on which damages could have been assessed, even had Yarnick been entitled to them.

*Decree affirmed, costs to be paid by appellant.*