**PARADEE OIL COMPANY, INC., a Delaware corporation, et al., Plaintiffs,**

**v.**

**PHILLIPS PETROLEUM COMPANY, a Delaware corporation, Defendant.**

Court of Chancery of Delaware, Kent.

May 10, 1974.

Harold Schmittinger and John J. Schmittinger, of Schmittinger & Rodriguez, Dover, for plaintiffs.

N. Maxson Terry, Jr., of Terry & Terry, Dover, for defendant.

BROWN, Vice Chancellor.

Plaintiffs, Paradee Oil Company, Inc. (hereafter "Paradee") and W. Charles Paradee, Sr. and Eleanor S. Paradee, his wife, ask that a preliminary injunction be issued against the defendant, Phillips Petroleum Company (hereafter "Phillips") to prevent it from terminating existing supply commitments of gasoline and related petroleum products pending a final hearing. A temporary restraining order was previously issued on May 31, 1973, in favor of Paradee and has been continued in effect ever since without objection from counsel so as to allow for extensive briefing and argument.

The factual matters alleged are many and are cumbersome to marshal with any degree of brevity. The plethora of legal arguments and authorities advanced by both sides unfortunately falls into the same category. Time simply does not permit

dealing with them all in this decision, nor does it become necessary to do so in the view I take of the case at this point.

The background for this action is similar to that found in various other recent decisions involving Phillips' withdrawal from its northeastern marketing area. In capsule form, it goes like this. Prior to 1961, Paradee had been a wholesale distributor of Cities Service petroleum products in and around the area of Dover and Kent County, Delaware, as well as some portions of Maryland's eastern shore. At the time Paradee owned one service station, leased eight, and supplied nine others. It owned three bulk storage facilities, served some two hundred commercial accounts and was purchasing some 6,000,000 gallons of petroleum products per year.

At about this time Phillips decided to enter the market area comprising the northeastern portion of the United States. In order to expedite its entry, it chose, among other things, to contact existing distributors in an effort to switch them to the Phillips brand. The plan offered to prospective jobbers was made appealing by means of possible expansion for the local jobber with assistance from Phillips and financial backing which it could arrange through others.

Paradee elected to take advantage of this opportunity and, after negotiations, the business union between the two was formed with their mutual and long-lasting prosperity being the goal. Phillips arranged for Paradee to borrow $113,000 in order to settle its account with Cities Service which loan was secured by a mortgage on real estate owned by Mr. and Mrs. Paradee individually.

Paradee thereafter methodically set about expanding its operations over the ensuing years with the knowledge, assistance and apparent approval of Phillips. As a result, at the time this action was commenced twelve years later in 1973, Paradee owned nine service stations, leased ten and supplied sixty-three, all of which represents an increase in service stations owned, leased or supplied under the Phillips flag from eighteen to eighty-two. Its bulk storage facilities were increased from three to six. Commercial accounts were increased from around two hundred to over six hundred. By the end of 1972 its yearly purchase of petroleum products had risen to 17,000,000 gallons.

It is further represented by Paradee that at the time this action was commenced it was distributing monthly about 400,000 gallons of fuel to farmers, 200,000 gallons to commercial fishermen and 75,000 gallons to commercial food processors and distributors. For the contract year extending through July 1974, it has obligated itself to supply some 2,000,000 gallons of fuel to state and local governments on the Delmarva Peninsula. It also has an annual obligation of about 3,000,000 gallons to federal military installations in the same area. It is not disputed that Paradee's efforts over the years have been profitable for Phillips or that Paradee is anything other than a satisfactory jobber.

While there is disagreement as to the representations made to Paradee by the agents of Phillips as an inducement for Paradee to contract with Phillips, two things are clear. First, Paradee was told that once Phillips had entered a market area, it had never retreated from it. Second, the clear impression given by Phillips was that in Paradee it was looking for a long term outlet for its products. Despite these factors, however, no comprehensive long term contract was formally executed. Rather, on standard forms provided and utilized by Phillips, individual contracts for a stated term of one year each were entered into concerning the products to be supplied by Phillips for resale and distribution by Paradee.

One such contract for the supply of fuel was dated June 5, 1961, as was a separate contract covering lubricating oil and grease. The Jobber Sign Lease agreement was dated May 12, 1961, the Purolator

agreement was dated June 1, 1961, and the jobber agreement covering Fram Filters, etc. was dated October 28, 1963. These contracts each provided that they could be terminated by either party upon ninety days notice to the other. During the course of the business relationship these same original contracts have been renewed between the parties on a yearly basis, presumably with some adjustment for fluctuating prices being included within the provisions of the various documents.

Starting with 1961 and running through 1969, and either at Phillips instigation or with its cooperation and approval, Paradee purchased or caused to be constructed seven service stations with the financing in each case being obtained through a third party with the assistance and backing of Phillips. In each case Paradee executed the mortgage and then leased the premises to Phillips which, in turn, subleased them back to Paradee for service station use. In each case it is represented that the monthly rental for the lease and sublease is the exact amount of the monthly mortgage payment. It is further represented that the amount borrowed for acquisition and construction of these service stations as well as the monthly payment figures, were in some manner based upon the anticipated gallonage that the station would sell. By their terms, the mortgages will not be paid out until 1979 through 1984. This same lease and lease back arrangement also applies to the mortgaged real estate owned individually by Mr. and Mrs. Paradee. As best I can ascertain from the papers on file, the collective balance on these mortgages is somewhere in the vicinity of $100,000.

However, although Paradee's efforts on behalf of Phillips products appear to have been commendable, Phillips overall efforts in its northeastern territory did not live up to expectations. Thus, in 1972, Phillips decided to withdraw from this geographical market area, with the exception of a small portion of southern Pennsylvania. By letter of June 16, 1972, it gave general notification to its jobbers and other personnel of its decision and that their supply and related contracts would be terminated upon the expiration of the existing contract periods. Later, as the result of some feeling on the part of Paradee that it was not within the withdrawal area, Paradee was given formal notice by letter dated February 19, 1973 that Phillips would supply it with no more petroleum products after May 31, 1973.

Upon learning that it was, in fact, to be terminated, it is represented by Paradee that it contacted every major petroleum supplier available to its geographic location but, presumably because of the suddenly discovered national shortage of petroleum, none were willing to take on Paradee (again presumably) because of its substantial volume of business. Paradee operates on a day-to-day basis, has practically no reserve of petroleum products and is thus dependent on obtaining product as needed from the terminals of its supplier if it is to stay in business. It contends that at such point as a supply of product is completely denied, it will, for all intent and purposes, be out of business within twenty-four hours.

Based on the foregoing factors, Paradee argues that the individual one-year supply contracts cannot be considered in isolation, but rather that the entire relationship between the parties, including the contracts, leases, subleases, mortgages, and mutual business expansion, must be considered as a whole. It argues that the conduct of Phillips over the years demonstrates an original intention to supply Paradee as a jobber and distributor of Phillips' products at least through the duration of the various mortgages, regardless of the policy of renewing the supply contracts on a yearly basis. Paradee contends that Phillips is thus prohibited under the doctrines of both equitable and promissory estoppel from terminating its supply obligation in the absence of Paradee's consent. Paradee also contends that it is entitled as a matter of law to a preliminary injunction by the terms of

the Delaware Franchise Security Law, 6 Del.C. §§ 2551–2557.

Thus, the questions presented appear to be (1) Is Phillips estopped from terminating the supply of product to Paradee under the existing circumstances? and (2) Does the Franchise Security Law prevent Phillips from terminating its previous supply arrangement with Paradee?

Initially I feel that the following factors may be assumed from the status of the evidence at this state. Howsoever the intended total relationship between the parties may be viewed, each side has always been aware that under the literal terms of the various individual contracts each could terminate the relationship upon giving the specified notice to the other. I cannot believe that Paradee seriously feels that it is legally bound to sell Phillips' products, and no other, until its final mortgage becomes satisfied in 1984.

Secondly, despite the multitude of legal theories advanced by both parties and the voluminous factual assertions made, it is obvious that the real reason the parties find themselves in Court is due to a contemporary circumstance which neither anticipated at the time of their various contractual commitments or the renewals thereof, namely, a national shortage of petroleum which, at least at this point, prevents Paradee from obtaining a new supplier for its business needs. As a practical matter, I have no doubt that if Paradee could have obtained another supply commitment prior to the expiration of its contracts with Phillips, this suit would not have occurred. Phillips avers that it was not aware of the impending fuel crises at the time it made its decision to withdraw from its northeast area, and if as one of the nation's largest suppliers, it was not aware of the coming problem it is difficult to charge its local jobber with any greater degree of knowledge. This circumstance, I feel, is the basic point of departure for a determination of the preliminary injunction issue.

As a third factor, although the country has been filled in recent months with news of crises and governmental activity stemming directly from a shortage of petroleum, Phillips does not rely upon a scarcity of fuel as its reason for terminating the relationship. On the contrary, Phillips asserts that it is withdrawing from a designated geographical region due to lack of business and that since Paradee is situated in that region—indeed Paradee appears to be the southernmost dealer in the region to be abandoned—it must necessarily be cut loose as a jobber, not because of anything it has done wrong but because of where it has the misfortune to be located. In another day this would in all probability have posed no problem because some other supplier would have been eager to pick up a distributor with Paradee's volume of business. However, under present conditions, it spells potential destruction to Paradee and harship to literally hundreds dependent on Paradee for fuel and livelihood.

■■■ Where parties provide by the express language of their contract that it may come to an end at the option of either party, upon notice to the other and without cause, such a stipulation will generally be upheld if fairly entered into. Chrysler v. Quinby, Del.Supr., 1 Storey 264, 144 A.2d 885 (1958). This rule, however, has been said to be subject to the qualification that such express right of termination not be contrary to equity and good conscience and not be in violation of any limitation imposed by statute. Acme Markets, Inc. v. Dawson Enterprises, Inc., Md.App., 253 Md. 76, 251 A.2d 839 (1969); 17A C.J.S. Contracts § 399, p. 482. Particularly has this limitation been applied, in one form or another, with regard to contracts between large manufacturers or producers and their dealers or distributors under a franchise relationship. See the discussion in 6 Corbin, Contracts § 1266.

Phillips cites several recent decisions in which it has been involved in support of its position. In particular, the United States District Courts for New Jersey and for the

Eastern District of Pennsylvania appear to be on its side. In North Penn Oil and Tire Company v. Phillips Petroleum Company, 358 F.Supp. 908 (E.D.Pa.1973) Judge Broderick went into considerable detail in a case having a similar factual background to strike down each and every argument advanced by the distributor and to hold that no showing of a probability of ultimate success had been made. In Consumers Oil Corporation of Trenton, New Jersey v. Phillips Petroleum Company (No. 456–73, D.C.N.J., June 27, 1973), also in a strikingly similar factual situation, the court acknowledged that irreparable injury would befall the distributor if an injunction was not issued, but refused the relief based on its finding that plaintiff had not shown even a remote chance of eventual success on the merits. Basically these decisions held that the supply contracts were clear and unambiguous and that Phillips was free to terminate them upon their expiration, regardless of the consequences, since it was doing so as a part of a withdrawal from a market area which had proved unprofitable.

On the other hand, our General Assembly has seen fit to enact in this State the Delaware Franchise Security Law found at 6 Del.C. Ch. 25, Subch. V. By 6 Del.C. § 2555 this law is made to apply to any franchise (as that term is therein defined) which is renewed subsequent to July 8, 1970. The individual contracts here have all been renewed since that date with at least constructive knowledge of the statute.

■ For the purposes of the statute, a "franchised distributor" includes a corporation with a place of business in this State purchasing products which bear the trademark or trade name of the producer for the primary purpose of selling such products to retail outlets. 6 Del.C. § 2551(1)(A). A "franchisor" includes a corporation selling or distributing to a franchised distributor on its own behalf products which bear the trademark or trade name of the producer. 6 Del.C. § 2551(2)(A). Based on the status of the record before me, I am of the opinion that Pardee and Phillips fall within those definitions.

It is further provided at 6 Del.C. § 2553 that if a "franchisor" gives notice that it intends to "unjustly" terminate or refuse to renew a franchise, the "franchised distributor" whose franchise is threatened, shall be entitled to secure from this Court "subject to general equitable principles" either an injunction or a mandatory order for renewal of the franchise. In addition, there is the following language:

> "Pending the issuance of such an order, the franchised distributor shall be entitled to an order enjoining such termination *pendente lite*, or in case of a failure or refusal to renew, a mandatory order extending the franchise *pendente lite*."

■ The key to eligibility for relief under this law is found at 6 Del.C. § 2552 where the term "unjustly" is defined as being "without good cause or in bad faith". In Globe Liquor Co. v. Four Roses Distillers Company, Del.Supr., 281 A.2d 19 (1971) this standard for lawful termination of a franchise was held to be sufficiently clear to withstand a constitutional attack against the statute on the grounds of vagueness. Although *Globe* was before our Supreme Court on certification of specific questions, I feel that it nonetheless has application here.

In *Globe* it was held that the Franchise Security Law as applied to the contract there considered[1] would violate Section 10, Article I of the Federal Constitution which mandates that no State shall pass any law impairing the obligation of a contract. It was also held that the statutory provision for damages for threatening to terminate

1. See the language of the Court at 281 A.2d 21: "We think the Delaware Franchise Security Law accordingly makes a substantive change in the rights and obligations *under this* contract." (Emphasis Added.) The contract there was made prior to the enactment of the statute to run for one year. There was no renewal involved.

without just cause was unconstitutional as being punitive and without regard to any actual loss to the franchise distributor.

■ At the same time the Court acknowledged that the Franchise Security Law created the right to secure an injunction in the Court of Chancery. It cast no adverse comments as to the validity of that remedy. It also recognized that the prohibition of the Contract Clause of the Federal Constitution is no longer absolute and must yield to the right of the State to legislate to protect vital interests of its people even though the incidental effect might be to alter the remedial rights of contracting individuals. 281 A.2d 21. The Court further recognized that the object of the law was to protect a "franchise distributor" who is "economically dependent upon the sale of the products and who has used his efforts in promoting them." 281 A.2d 23. The public policy behind the passage of the Franchise Security Law is clearly expressed in its preamble. 57 Del.L. Ch. 693.[2]

■ Paradee suggests that the above-quoted portion of 6 Del.C. § 2553 gives it an absolute right to injunctive relief *pendente lite*, and that the only discretion left to the Court is whether or not to grant permanent relief after final hearing. I cannot agree, since to do so would require the mere ministerial act of issuing a preliminary injunction as a matter of course upon the filing of a complaint. I do not feel that the statutory language "shall be entitled to an order" either requires or intended such an automatic result.

■ I do feel, however, that the purpose of the Franchise Security Law and the test of "just cause" which it establishes as the measure for relief, creates a distinct criterion to be applied in determining whether or not a distributor has demonstrated such a likelihood of ultimate success as to be entitled to a preliminary injunction. I do not feel that Paradee must show at this point a likelihood of eventual success on the merits of its estoppel or contract arguments, but rather, in order to maintain the status quo pending a full hearing, it must show some probability that Phillips is attempting to terminate their long relationship in bad faith or without just cause for doing so, regardless of the language of their yearly contracts. For this reason I am of the opinion that the decisions in *North Penn* and *Consumer Oil, supra* are distinguishable because of the Franchise Security Law.

With this in mind, I take note of the following factors which are before the Court:

1. Phillips states that it must terminate Paradee because it is within the geographical area from which it is withdrawing and because Paradee draws its product from Phillips' terminal in Gloucester City, New Jersey. It contends understandably that it cannot keep the terminal open to supply only one customer. However, when Paradee first went with Phillips, before the Gloucester City terminal was built, it drew product from a terminal near Baltimore, from which terminal Phillips is still obtaining product for other customers, some of whom apparently operate in eastern Mary-

2. "Whereas, the relationship between franchised distributors and their suppliers and licensors is marked by economic dependence of the franchised distributor; and

"Whereas, the suppliers and licensors of franchised distributors have terminated franchises on short notice without just cause, and have threatened and continue to threaten such termination; and

"Whereas, such unjustified terminations unfairly deprive franchised distributors of their equity and the fruits of their labor after they have created a favorable market for the products, trademarks and trade names of their suppliers and licensors; and

"Whereas, such terminations eliminate jobs, eliminate the productivity of going concerns and otherwise adversely affect the economic stability of this state; and

*      *      *      *      *

"Whereas, these conditions are detrimental to the public interest and general welfare of this state; and

"Whereas, these detrimental conditions cannot be remedied through bargaining because of the franchised distributors' lack of bargaining power."

land near Paradee's present territory. Resumption of this arrangement would not seem to be an unreasonable alternative.

2. The Friendly Oil Company, which according to a Phillips affidavit is not a subsidiary but is rather an "assumed name" operation of Phillips, does business out of nearby Havre de Grace, Maryland and operates to the north and northwest of Paradee's territory on the Delmarva Peninsula. Eastern Shore Oil Company does business out of the Salisbury, Maryland area and operates to the south of Paradee on the Delmarva Peninsula. It is not being terminated as a Phillips distributor. Thus it seems, Phillips' products (whether under the Phillips name or not) will continue to be sold in the area around Paradee.

3. As an exhibit attached to an affidavit filed by Phillips there is a copy of an inter-corporate letter addressed by Phillips' management to its executive committee requesting approval for its withdrawal from its northeast marketing area. The following statement of future intent appears in this letter:

> "We intend to sell the branded volume now being sold in this area in the inter-refinery market and/or the unbranded market, or evaluate reducing motor fuel purchases."

Thus it seems entirely possible, as Paradee contends, that Phillips may not be entirely withdrawing from the sale of petroleum products in the area, but only curtailing sales under its own brand name.

4. Although Phillips may not have been aware of the coming petroleum shortage when it made its decision to withdraw, it had to be aware of it before its announced termination date of May 31, 1973. It does not challenge Paradee's assertion at this point that it cannot obtain another supplier. Thus, with regard to the issue of good faith as to Paradee, Phillips seeks to stand on its contractual right to terminate a successful and heavily committed distributor of the past twelve years with notice that Paradee cannot obtain another supplier and may possibly be put out of business, all for the reason that Paradee happens to be the southernmost distributor in the area to be abandoned (an area around which other Phillips' operations will continue).

5. The letter of February 19, 1973, by which Phillips formally notified Paradee that it intended to terminate all supply contracts as of May 31, 1973, specifically provided that no lease or sublease agreement between the two would be affected or terminated. Thus, if Paradee has no product with which to supply the several service stations which it owns and for which it is responsible on the mortgages, including the property owned by Mr. and Mrs. Paradee individually, it may well find itself in a position wherein it is paying for stations which it cannot operate but which are bound by lease to the party whose business decision brought about their inoperation.

■ Based upon these factors, I feel that Paradee has, at least initially, demonstrated a probability of success in proving that Phillips is attempting "unjustly" to terminate and refuse to renew the relationship within the meaning of the Franchise Security Law. The likelihood of immediate and irreparable harm that will befall Paradee if the injunction is not granted is without question. In balancing the equities between the parties, i. e., the harm to Phillips if relief is given as opposed to the potential harm to Paradee if it is not, the scales clearly tip toward Paradee. I am therefore of the opinion that the prerequisites for a preliminary injunction have been met. Arbour Park Civic Association v. City of Newark, Del.Ch., 267 A.2d 904 (1970); Sandler v. Schenley Industries, 32 Del.Ch. 46, 79 A.2d 606 (1951); Gerlach v. Gillam, 37 Del.Ch. 244, 139 A.2d 591 (1958).

Accordingly, I am of the opinion that the preliminary injunction order should is-

sue so as to maintain the existing status between the parties pending final hearing on all issues. The present bond shall continue in the same amount. Counsel for Paradee are directed to submit an appropriate order, on notice, within ten days.