**33 FLAVORS OF GREATER DELAWARE VALLEY, INC. a Delaware Corporation, and Richard B. Tippett, Plaintiffs,**

v.

**BRESLER'S 33 FLAVORS, INC., an Illinois Corporation, Bresler Ice Cream Company, an Illinois Corporation and Richman Ice Cream Company, a New Jersey Corporation, Defendants.**

Civ. A. No. 78–383.

United States District Court,
D. Delaware.

May 14, 1979.

218

Max S. Bell, Jr., and Thomas L. Ambro of Richards, Layton & Finger, Wilmington, Del., for plaintiffs.

Paul P. Welsh, and Judy O. Hodas of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Barry L. Kroll of Jacobs, Williams & Montgomery, Chicago, Ill., for defendants.

## OPINION

LATCHUM, Chief Judge.

On September 1, 1978 the plaintiffs, Richard B. Tippett ("Tippett") and 33 Flavors of Greater Delaware Valley, Inc. ("GDV"), filed a complaint in the Delaware Chancery Court against Bresler's 33 Flavors, Inc. ("Breslers") and the other defendants. In that complaint the plaintiffs alleged that Breslers had violated the Delaware Franchise Security Law [1] ("Franchise Act") by unjustly terminating an agreement between Breslers and Tippett, and by terminating that same agreement without giving proper notice.[2] (Docket Item 1, Exhibit A, Counts I & II). Breslers responded to the complaint by removing it to this Court on September 7, 1978.[3]

Within a few days after the complaint was removed to this Court the plaintiffs filed a motion for a temporary restraining order against the allegedly improper termination. (Docket Item 3). The Court denied that motion in an order dated September 15, 1978.[4] (Docket Item 10). In the same order the Court also directed the parties to engage in an expedited discovery process and ordered the trial on the merits of the plaintiffs' claims to be advanced and consolidated with the hearing on an anticipated motion for a preliminary injunction. *Id.* At a pre-trial conference, however, the Court and the parties agreed that the trial should be limited to the issue of whether the plaintiffs are entitled to any injunctive relief under the Franchise Act or common law contract principles.[5] A trial on that basis was commenced on October 16, 1978 and lasted for five days. Post trial briefs have been submitted by the parties and the matter is now ready for final disposition. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), F.R.Civ.P.

## I. BACKGROUND FACTS

Bresler Ice Cream Company ("BIC") is an ice cream manufacturing company which has been in business for almost fifty years. (PX 5, p. 1, Tr. E–92, E–110, E–119).[6] At the time this suit was filed BIC was incorporated in Illinois and had its main offices and manufacturing plant in Chicago, Illinois. (Docket Item 1, p. 2; Tr. E–98).

In the Spring of 1962 BIC began to market some of its products through franchised shops. (PX 2, p. 2; Tr. E–94). This new operation[7] involved the merchandising of

---

**1.** 6 *Del.C.* §§ 2551–2556.

**2.** The complaint also alleged a claim for tortiously interfering with a business relationship, and a general claim for other alleged breaches of contract by Breslers. Docket Item 1, Exhibit A, Counts III & IV.

**3.** The federal jurisdictional basis for the removal petition was diversity of citizenship, 28 U.S.C. § 1332(a)(1). (Docket Item 1).

**4.** The Court's order was based on three separate conclusions. They were: (a) that the plaintiffs had failed to demonstrate that there was a strong probability that they would succeed on the merits; (b) that the plaintiffs had failed to show that they would suffer irreparable harm if a temporary restraining order were not issued; and (c) that any harm that the plaintiffs would suffer was offset by the harm that would result to the defendants if the temporary restraining order were issued. Docket Item 9 at 4–9.

**5.** The plaintiffs' motion for a temporary restraining order was based solely on the Franchise Act. (Docket Item 7). Since that time, however, the plaintiffs have consistently relied on both common law principles and the Franchise Act. (Docket Items 26, 39, 43). The defendants have likewise asserted that the termination was proper under both legal concepts. (Docket Item 42).

**6.** Plaintiffs' exhibits will be designated as "PX —" and defendants' exhibits will be designated as "DX —." References to the transcript ("Tr.") will be by volume and page number.

**7.** The BIC franchised shops were patterned after the Baskin-Robbins franchise program which had been operating for approximately fifteen or sixteen years before BIC began its own franchise program. (Tr. E–95–96).

multi-flavors of hand-packed and dipped ice cream, soda fountain products, and other made-to-order ice cream specialty products through independently operated shops. (PX 2, p. 2). Each of these franchised shops were to have a standardized decor and were to operate under the trade name of Bresler's 33 Flavors Ice Cream Shops (PX 2, p. 2, 14). In addition, each of the shops was to sell only those products which were approved by BIC. (Tr. A–97; PX 1, App. 1, pp. 2–3).

The franchise operation was originally conducted by a division of BIC which was known as Bresler's 33 Flavors Division. (Tr. E–95). In later years a separate, but wholly owned Illinois corporation, was formed to conduct the franchise operation under the name of Bresler's 33 Flavors, Inc. (Tr. E–88, 95; PX 2, § 1(D)). For the sake of convenience both the division and the corporation hereafter will be referred to simply as Breslers.

During the first year of its existence the Breslers franchise program operated only in the Chicago area and all of the shops that were established during that time were selected, set up, and serviced directly by employees of Breslers. (Tr. E–97, E–62). In addition, the independent shop owners for all of those shops were recruited and selected by Breslers' employees. (Tr. E–62, E–103–104). That policy of directly franchising ice cream shops was still being followed by Breslers, at the time of the trial, with regard to the Chicago area and with regard to certain other areas of the country. (Tr. E–62, E–109–110).

At the beginning of the second year of its existence, the Breslers franchise program also began to utilize a second method of operation. (Tr. E–103). This other method of operation consisted of the granting of licenses to independent businessmen who would then be responsible for establishing Breslers franchised ice cream shops in designated areas of the country. (Tr. E–103–104). Within the Breslers franchise program these independent businessmen are known as regional licensees or territorial licensees ("T.L.s"). (Tr. E–103–104).

Prior to the date of Tippett's termination there were nine T.L.s [8] in the Bresler system. Those nine T.L.s were responsible for more than half of the approximately 350 Bresler shops that were then in existence.[9] (Tr. E–104–105). In addition, those nine T.L.s also had the rights to the future development of about 50 percent of Breslers' total marketing area. (Id.).

## II. TIPPETT'S RELATIONSHIP WITH BRESLERS

Tippett's relationship with Breslers began in April of 1966 when Tippett inquired about the possibility of establishing a Breslers shop in the Wilmington area. (Tr. A–12, PX 5). That initial inquiry eventually[10] led to the signing by Tippett and Breslers[11] of a Territorial License Agreement ("T.L. Agreement") on June 23, 1966. (Tr. A–13, PX 1). Under the terms of the T.L. Agreement, Tippett was granted the exclusive authority to establish and operate Breslers shops in the State of Delaware and in ten counties in Pennsylvania. (PX 1, § B1(A)). He was also given the exclusive authority to grant licenses to others to operate Breslers shops within the same territory. (PX 1, § B1(B)). This grant of authority was for an indefinite period and could not be revoked or terminated by Breslers unless Tip-

8. There have been no new T.L.s since 1970–71 (Tr. A–30, E–181).

9. The locations of the various shops are shown on a map introduced into evidence as DX 48. (Tr. D–91).

10. For the history of the correspondence and negotiations leading to the signing of the T.L. Agreement see PX 5, 10, 78 and the transcript at A–12–15.

11. The Agreement was actually signed by BIC which later assigned its rights and duties to Breslers. (PX 1, Docket Item 12, ¶ 7). Tippett also later assigned his rights and duties under the T.L. Agreement to GDV which is a Delaware corporation wholly owned by Tippett. (Docket Item 1, Ex. A, ¶ 1, Docket Item 12, ¶ 7, Tr. A–19). However, for convenience the Court will continue to refer to Tippett as the party with rights and duties under the T.L. Agreement.

pett breached the T.L. Agreement and then failed to cure that breach within thirty days after being given notice of its existence. (PX 1, § F2).

In addition to the above grant of authority the T.L. Agreement also provided that Breslers would, among other things, (a) provide training and information to Tippett; (b) place contracts for the purchase of equipment and printed supplies to be used in the shops; (c) aid and advise Tippett on the mechanics of operating a Breslers shop; and (d) sell and deliver to Tippett all the ice cream and ice cream products required by the shops in his territory. (PX 1, §§ D & E4(A)).

In consideration for the grants made by Breslers and the other promises noted above, Tippett agreed inter alia to the several following things: (a) to pay Breslers $12,000 [12] as an initial fee for the license he was granted; (b) to pay an additional $1,000 as a licensing fee for each Breslers shop opened in his territory; (c) to purchase all the ice cream and ice cream related products required by the shops in his territory from Breslers; (d) to open two shops within one year from the date of the T.L. Agreement; (e) to open five shops within each year thereafter for five years and at all times after the sixth year from the date of the T.L. Agreement to have twenty-seven shops open for business; and (f) to require all of his shops to conform to the Breslers franchise program. (PX 1, §§ C & F).

One major change was made in this contractual arrangement before Tippett had opened any shops. That change involved the manner in which the shops in Tippett's territory were to be supplied with ice cream. Under the original agreement it was contemplated that Breslers would sell ice cream to Tippett and Tippett in turn would act as an ice cream distributor for all the shops in his territory. (Tr. A–55, C–150, D–144–145). In March of 1967, however, Breslers entered into an agreement with the Richman Ice Cream Company

("Richman") which totally altered that contemplated arrangement. (PX 4).

Breslers' agreement with Richman provided that Richman would manufacture ice cream according to formulas supplied by Breslers and then sell that ice cream directly to the shops in Tippett's territory. (PX 3, p. 107, PX 4, Tr. A–55–60, C–149–152). Under that arrangement neither Breslers nor Tippett were directly involved in the actual purchasing or selling of the ice cream. (Tr. C–151). Both Breslers and Tippett did, however, receive a monthly check from Richman which was computed by multiplying the total number of gallons sold of each type of ice cream times the current license fee or override. (PX 3, pp. 6–7, Tr. C–151).

Breslers did not consult with Tippett before it entered into the above agreement with Richman. Nevertheless, Tippett was made aware of the new arrangement soon after it was made and during the twelve years in which the parties operated under the arrangement Tippett never complained about it or about Richman's performance. (Tr. A–55, C–150–152, D–55, E–155, DX 5).

### III. THE PERFORMANCE PROBLEMS

The parties operated under the T.L. Agreement as modified by the arrangement with Richman for a period of twelve years. During those twelve years several types of performance problems developed and eventually were cited by Breslers as a basis for terminating Tippett's T.L. Agreement on August 14, 1978. (DX 45).

#### A. The Quota Problem

The first problem that developed was Tippett's failure to meet the shop opening or "quota" requirements of the T.L. Agreement.

In his first year of operation Tippett was fairly successful with regard to the number of shops he opened. (See, PX 6). Breslers started him off on the right track by obtaining his first leased location for him. (Tr. A–23). Tippett found a shop owner for

---

12. Because of Tippett's financial position at the time the T.L. Agreement was signed, Breslers permitted Tippett to pay the $12,000 initial fee in three installments. (PX 1, § C, Tr. A–15).

that location and in addition obtained two other leased locations and found shop owners for those locations as well. (Tr. A–22, PX 6).[13]

During the next three years, however, Tippett was not able to sustain the pace he had set in the first year. In the second year he opened only one shop. (PX 6). In the third year he again managed to open three shops, but at the same time he lost one of his original shops. (PX 6). Finally, in the fourth year of operation he opened two shops. (PX 6).

His fifth year of operation was his best year. During that year he opened five shops. (PX 6). In the following year, however, he opened only two shops and four other shops closed. (PX 6). The last six years of his operation were even worse. Over the course of those six years he never again opened more than two shops in any one year and there were two years in which he did not open any shops. (PX 6). Moreover, in all of those years except one, the number of shop closings equaled or exceeded the number of openings. (PX 6). This process of decay was so bad that by the end

of the twelfth year Tippett had only nine shops opened, or in other words, only one more shop than he had open eight years earlier. (PX 6).

Tippett's poor performance [14] during the last six or seven years that he acted as a T.L. primarily resulted from a growing conviction on his part that an ice cream specialty shop generally could not produce a reasonable net income for the shop owner, unless the shop was located in an enclosed mall.[15] (Tr. A–30–31, 78–79, 90, 126). As a result of this conviction Tippett essentially refused to establish shops in any location other than enclosed malls.[16] (DX 11, Tr. A–90, C–168–170).

Breslers' attitude toward Tippett's failure to meet the quota requirements of the T.L. Agreement did not vary significantly over the years. In the early years of their relationship Breslers did apply some pressure on Tippett by issuing warning or threatening letters concerning his failure to meet the quota requirements. (DX 35, 32, 33, 36. *See also*, DX 34, DX 13). Breslers never carried out its threats however, and eventu-

13. Since the T.L. Agreement's yearly and cumulative quota provisions were based on the date of the Agreement, the Court has analyzed Tippett's shop opening performance in the same manner. Based on a July 1 to July 1 operating year Tippett's overall performance was as follows:

| Year | 66–67 | 67–68 | 68–69 | 69–70 | 70–71 | 71–72 | 72–73 | 73–74 | 74–75 | 75–76 | 76–77 | 77–78 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shops Opened | 3 | 1 | 3 | 2 | 5 | 2 | 2 | 1 | 0 | 2 | 1 | 0 |
| Shops Closed | 0 | 0 | 1 | 0 | 0 | 4 | 0 | 2 | 2 | 2 | 1 | 1 |
| Total Operating | 3 | 4 | 6 | 8 | 13 | 11 | 13 | 12 | 10 | 10 | 10 | 9 |

(*See* PX 6)

Out of the 22 shops Tippett opened, 15 were located in Pennsylvania, 6 were located in Delaware, and one was located in New Jersey. (PX 6, 7).

14. Tippett had the worst percentage of closed shops of all the T.L.s (Tr. C–167, E–110–111).

15. Both parties presented a considerable amount of evidence on the question of whether ice cream specialty shops were viable operations in locations other then enclosed malls. (PX 36–38, Tr. A–80, A–154–158, B–27–57, B–62–67, B–72–75, B–80–81, B–90–99, C–49–52,

C–88–89, D–74–79, D–119–120). Without reviewing all of that evidence here, the Court finds that ice cream specialty shops can be viable operations in locations other than enclosed malls and that such non-mall locations existed in Tippett's territory. (Tr. A–41–42, C–49–51, C–89, C–181–182, D–70–74, D–118–120).

16. Tippett testified at trial that he developed an "ethical" problem with regard to selling franchise locations that were not in large enclosed malls. (Tr. A–90, 126).

ally the letters also stopped. In fact, the record indicates that the president of Breslers told Tippett in 1970 that he did not have to worry about meeting the quota requirements. (DX 36, PX 47, Tr. C–121–124).

Nothing further was said about Tippett's quota defaults until January of 1977. At that point Breslers issued a general memorandum to all of the T.L.s that stated that Breslers' past policy of extreme leniency with regard to quota defaults would not continue in the future. (DX 10). The memorandum went on to state that while Breslers would not be "capricious" with regard to future quota defaults, it did "expect definitive results henceforth" and it would be closely evaluating each T.L.'s progress toward achieving his contractual quotas. *Id.* No demand was made, however, that Tippett achieve his quota within a specified period of time. Nor was any demand made that Tippett open a specific number of stores within a specified period of time. In fact, Breslers stated in the memorandum that it was willing to re-evaluate each T.L.'s territory with a view towards establishing a revised quota for each territory. *Id.* No re-evaluation was ever made of Tippett's territory.[17]

The quota problem was not discussed again until almost a year later at the annual T.L. seminar. At that meeting Breslers requested each T.L. to give a report as to the number of shops they planned to open during the next year. (Tr. C–125, DX 30). Tippett stated that he thought he would be opening two shops. (DX 30). Approximately five months later Breslers wrote to Tippett to check on the progress of those two proposed shops. (DX 30). Tippett responded in a letter which stated that there must have been a misunderstanding be-

cause he had merely made a "forecast" as to the "new shop potential during 1978." (DX 37, Tr. C–127). He then informed Breslers that neither of those potential shops would actually open in 1978. (DX 37). Breslers did not respond immediately to Tippett's letter. Two months later, however, Breslers issued a notice of default[18] which cited, in part, Tippett's failure to meet the quota requirements of the T.L. Agreement. (PX 18). According to that notice Tippett would be subject to termination if he failed to cure that default within thirty days. (PX 18).

### B. *The Non-Approved Product Problem*

The second problem that developed during Tippett's twelve years as a T.L. was a conformance problem. The T.L. Agreement required Tippett to have all of the shop owners in his territory sign a standard agreement under which the store owners agreed to sell only those products that were approved by Breslers. (PX 1, § E6, App. 1 § D6). Tippett, in turn, was obligated to take all necessary steps to enforce that agreement if any default should occur. (PX 1, § E9(A)).

Tippett had been operating for no more than three years when shop owners in his territory began selling unapproved products. (Tr. A–53). As time progressed virtually all of the shops in his territory began selling unapproved products.[19] (DX 14).

For many years Tippett did little to correct the situation. (Tr. A–51–53, 100, C–197). In fact, by 1975 Tippett was affirmatively suggesting to the shop owners in his territory that they begin selling unapproved products and assisting them in their efforts to do so. (Tr. C–197–198, PX 16). At the time Tippett was taking these actions, he

---

17. Tippett did attempt to take advantage of Breslers' offer to re-evaluate his territory. He and Breslers could not agree, however, on the method by which a revised quota should be established and consequently no real effort was ever made to calculate a revised quota. (DX 11, 12, PX 17).

18. Two other default notices had previously been issued to Tippett; the first in August 1976 and the second in January 1977. (DX 14, PX

82). Neither of those notices, however, made any reference to a default with regard to the quota requirements. (DX 14, PX 82).

19. The following are examples of the unapproved products that were sold at one time or another by the shops in Tippett's territory: sandwiches, hot dogs, crackers, pretzels, popcorn, potato chips, and donuts. (DX 14).

knew that he was breaching the T.L. Agreement. (Tr. C–199–200). He committed those intentional breaches of contract because he believed[20] that many of the shops in his territory could not survive, or at least, could not produce a reasonable net income for the shop owner unless they sold more than the ice cream and ice cream related products that were approved by Breslers. (Tr. A–100, 126–129, C–197, PX 13, 14).

Breslers' attitude toward Tippett's failure to enforce the shop owners' agreements was similar to its attitude toward the quota requirements. For many years Breslers more or less ignored the fact that unapproved products were being sold by the shops in Tippett's territory. (Tr. A–98, PX 16). In fact, Breslers expressly allowed one of the shops in Tippett's territory to sell submarine sandwiches as a "test" for a period of more than six years. (Tr. A–51–54, B–177–178).

In 1976, however, Breslers' attitude clearly changed. (Tr. A–98). Over the next year and a half, Breslers put a considerable amount of pressure on Tippett to enforce the shop owners' agreements. (DX 14, PX 81, 82, 83, 84).

The pressure that Breslers applied did not change Tippett's attitude about the sale of unapproved products. (Tr. A–100). It did, however, make him realize that Breslers

was serious about the new enforcement policy and accordingly he made an effort to comply with the new policy. (PX 81, 83, 84, DX 18, Tr. A–100). His efforts were not as extensive as Breslers would have liked and they did not produce the immediate results that Breslers desired. (DX 50, Tr. E–147–148). Progress did result, however, and by the time of the final default notice Tippett had virtually succeeded in eliminating all unapproved products from the shops in his territory.[21] (PX 86).

### C. The Other Conformance Problem

The final problem which developed during Tippett's term as a T.L. was also a conformance problem.[22] In addition to the requirement that they sell only those products that were approved, the shop owners were also required, under their individual agreements with Tippett, to use only approved toppings, syrups and approved paper goods in their shops.[23] (PX 1, App. §§ D6 & 8). Tippett was likewise obligated under the T.L. Agreement to enforce these requirements. (PX 1, § E9(A)). Breslers, on the other hand, was required to find and designate a distributor who could supply the shops with the approved syrups and paper goods. (PX 1, § D3).

The first supplier so designated by Breslers as the authorized distributor was a Chicago-based company known as Dore. (Tr. A–103, PX 75). That company did not

---

**20.** This belief on Tippett's part was conveyed to Breslers in a series of letters which consistently urged Breslers to expand its approved product line or to at least allow the shops in his territory to experiment with different products. (DX 16, PX 13, 14, 15; Tr. A–44). At first, Breslers responded to these letters by carefully explaining the reasons for refusing to expand its product line and refusing to allow the shops in his territory to experiment. (DX 16, 17, Tr. A–67). Eventually, however, when Tippett refused to accept these explanations and continued to press for additions to the product line, Breslers began simply to ignore the letters. (Tr. A–67).

**21.** The final default notice cited only two cases of unapproved products being sold by shops in Tippett's territory. (PX 18). Both of those cases involved the sale of "Lance" crackers and cookies. (*Id.*). The continued sale of those products resulted from a misunderstanding as to whether or not those products were ap-

proved and when Tippett was finally informed that they were unapproved they were removed. (PX 19, p. 4, DX 44, DX 43, Tr. A–119–121).

**22.** One other problem was cited by Breslers in the final default notice. (PX 18). That problem was the unapproved wall decor that existed in one of the shops in Tippett's territory. (*Id.*). Tippett attempted to cure that problem by sending the shop owner a default notice. (PX 19, p. 3, Tr. A–115–118). The shop owner agreed to redecorate his shop in order to conform to the Bresler requirements. (Tr. A–116). That redecorating, however, had not yet been accomplished when Breslers sent the Notice of Termination to Tippett. (Tr. A–117–118, DX 45, PX 77).

**23.** Approved paper goods were napkins, cups, boxes, bags, etc., that had the Breslers' name and trademark on them. (Tr. A–102).

perform satisfactorily. (Tr. A–103, PX 75). Dore consistently delivered the wrong supplies, the wrong number of supplies, or stated that it was not able to fill an order. (Tr. A–103). As a result of these problems with the Dore Company, the shop owners in Tippett's territory developed a habit of buying unprinted paper goods and unapproved syrups from local suppliers upon whom they could depend. (Tr. A–104).

Breslers eventually recognized the problems that had developed with regard to the performance of the Dore Company and in 1974 it designated a different company as the authorized distributor of paper goods and syrups. (PX 75, Tr. A–105). The new company was a franchised system of distributors which operated under the name of Unijax. (Tr. A–105). Unijax proved to be a much more reliable supplier of printed goods and approved syrups. (Tr. A–105). Some problems did persist, however, and many of the shop owners in Tippett's territory continued occasionally to buy unprinted paper goods and unapproved syrups from local suppliers. (Tr. A–105–107).

In 1976 Breslers began to complain about this continued lack of conformance. (DX 14). Tippett responded by promising in October 1976 to "press for full utilization" of Breslers approved toppings, syrups and imprinted goods. (PX 83). He followed up on this promise by sending a letter to all the shop owners in his territory stressing the importance of conformance. (DX 18). His efforts, however, were not effective. (DX 50).

Tippett's inability to obtain conformance at that point was at least partially due to continued problems with Unijax. (PX 86, Tr. A–105–107). Those problems, however, were eventually eliminated. In early 1978 a local supplier named Marstans was designated as an approved supplier, and by March of 1978 Marstans had a full line of approved toppings, syrups, and paper goods in stock. (DX 50, p. 3, PX 86, Tr. A–107–108, D–14).

Tippett recognized the fact that the shops in his territory could conform to the syrup and paper goods requirements after March 1978. (PX 86, Tr. D–14). He was also aware of the importance of these conformance requirements to both the Breslers system and the shops in his territory. (PX 19, p. 2, Tr. D–17–18, D–84). Nevertheless, Tippett refused to take affirmative action against those shops that continued to use unapproved toppings, syrups, and paper goods after March 1978. Instead, he insisted on using "persuasion," to try and get them to use only approved toppings, syrups, and paper goods. (PX 86, PX 10, p. 3, Tr. D–14–17). As of the date of the final default notice, however, Tippett had not yet succeeded in convincing the shop owners to comply fully with the conformance requirements. (PX 19, Tr. D–14–17).

## IV. THE TERMINATION

The final notice of default was issued on May 9, 1978.[24] (PX 18). That notice stated that Tippett was in default because: (a) five of the shops in his territory were using non-imprinted paper goods and supplies and unapproved syrups and toppings; (b) one of the shops in his territory had an unapproved interior decor; (c) two of the shops in his territory were selling unapproved products; and (d) he had opened only one shop in 1977 and presently had open only nine shops. (PX 18). The notice went on to warn Tippett that if he failed to "cure said defaults within 30 days" Breslers would "have the right to affect [sic] a termination of your Territorial License Agreement." (PX 18).

Tippett waited almost thirty days before he responded to the May 9, 1978 notice of default. (PX 18, p. 3, PX 19). He then wrote a letter to Breslers which claimed that the alleged defaults in the notice did not give Breslers the right to terminate him, and which essentially challenged Breslers to settle the dispute in court. (PX 19). Tippett also affirmatively stated, with re-

---

24. Tippett had been warned in February 1978 that if he did not correct several conformance problems within thirty days he would be given a notice of default and if he did not obtain conformance thereafter he would be terminated. (DX 8).

gard to the alleged default resulting from the use of non-imprinted paper goods and unapproved syrups, that he would not,

> be bullied by your 30 day default cure period to make [sic] legal moves against the few remaining franchises without our total approved line until my persuasion has been exhausted.

(PX 19, p. 3). Finally, with regard to the alleged quota default Tippett stated:

> [a]s for your claim I [sic] should have 27 shops now I agree with this. The only issue is WHY I do not have 27 shops. I am well prepared to show Bresler [sic] is the primary cause of this situation.

(PX 19, p. 4).

Approximately two months later Breslers wrote a letter to Tippett which advised him that the T.L. Agreement was thereby "terminated, effective immediately." (DX 45). The letter stated several reasons for the termination including Tippett's failure to cure the default set forth in the final notice of default.[25] Breslers had not inspected Tippett's territory before it issued that letter to ascertain whether or not Tippett had cured the default. (Tr. E–157–158, 160). Tippett testified at trial that in fact he had not cured the quota default. (Tr. A–144–

146). He also testified that several of the shop owners in his territory were still using non-imprinted goods and unapproved syrups as of the date of the termination letter and that he had not placed any of those shop owners in default or taken any other serious action against them. (Tr. C–202–204, D–15–17).

## V. THE CHOICE OF LAW

■■■ Tippett contends that the termination of the T.L. Agreement was improper under common law principles and under the Delaware Franchise Act.[26] There is some question, however, as to whether Delaware law or Illinois law is applicable.[27] The Court, therefore, must first determine what law is applicable[28] before it can consider the merits of Tippett's contentions.

■■■ The T.L. Agreement provides that it "shall be interpreted and construed in accordance with, and shall be governed by the internal laws of the State of Illinois." (PX 1, § F12). Such "choice of law" clauses are generally recognized and given effect by the Delaware courts. *Falcon Tankers, Inc. v. Litton Systems, Inc.*, 300 A.2d 231, 235 (Del.Super.1972); *American Electronic Laboratories, Inc. v. Dopp*, 352 F.Supp. 835

---

**25.** The reasons were stated in full in the letter as follows:

It is clear that you have not only failed to demonstrate any cooperation with the undersigned, but have also failed to demonstrate a capacity or willingness, as other Territorial Licensors have demonstrated, to work with the Bresler's 33 Flavors Ice Cream Shop system. It is also clear that you have failed to enforce the terms of your shop owners' license agreements and you have grossly failed to meet the reasonable and mutually agreed-upon store opening quotas as specified in Section E, page four, of the below-referenced Territorial License Agreement. In fact, in 1977 you opened only one Bresler's 33 Flavors Ice Cream Shop, and in 1976 and 1978 you failed to open any Bresler's 33 Flavors Ice Cream Shops in your territory.

Instead of the twenty-seven Bresler's 33 Flavors Ice Cream Shops you should have opened for business within your territory since 1972, at this time there are only nine Bresler's 33 Flavors Ice Cream Shops opened and in operation in your territory.

Thus, due to your overall lack of attentiveness to your responsibilities, obligations and the Bresler's 33 Flavors Ice Cream Shop program,

combined with your failure to cure the default set forth in the notice of default mailed to you on May 9, 1978, you have left us no alternative but to terminate your Territorial License Agreement. (DX 45).

**26.** 6 *Del.C.* §§ 2551–2556.

**27.** Illinois does have a franchise act. *See*, 121½ *Ill.Rev.Stat.* §§ 701–740 (1974). Unlike the Delaware Franchise Act, however, that Act places no limitations on the manner in which a "franchise agreement" may be terminated. Instead it simply requires registration and the use of a disclosure statement. 121½ *Ill.Rev.Stat.* § 704. A conflict of laws is thus presented because if Illinois law is applicable, Tippett will be forced to rely solely on common law principles. *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1308 (C.A.3, 1978).

**28.** In making that determination the Court must follow the choice of law rules of Delaware, the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co. Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

(D.Del.1972). There are some limits to this willingness to accept the choice of law made by the parties to a contract. *Wilmington Trust Co. v. Wilmington Trust Co.*, 26 Del. Ch. 397, 24 A.2d 309, 313 (Del.Sup.1942).

■ In the present case the public policy expressed in the Franchise Act [29] might act as such a limitation on the parties' rights if the T.L. Agreement is within the scope of that Act. *Cf. Business Incentives Co. v. Sony Corp. of America*, 397 F.Supp. 63, 67 (S.D.N.Y.1975). The Court concludes, therefore, that it should determine whether or not the T.L. Agreement is within the scope of the Franchise Act before it makes a decision as to the effect of the choice of law clause.

The scope of the Franchise Act is established primarily [30] in its definitional section. 6 *Del.C.* § 2551. That section sets out definitions for the following four interrelated terms: (a) Franchised Distributor; (b) Franchisor; (c) Franchise; and (d) Products. A franchise is defined as a:

> contract . . . governing the business relationship within this State between a franchised distributor and a franchisor where the franchised distributor is required to pay more than $100.00 to enter into such contract.

6 *Del.C.* § 2551(3). In the present case the T.L. Agreement is clearly a contract which governs the business relationship within this State [31] between Tippett and Breslers. In addition, Tippett was required to pay more than $100.00 to enter into the T.L.

Agreement. That agreement, therefore, would qualify as a franchise if Tippett was a franchised distributor and Breslers was a franchisor within the meaning of the Franchise Act.

A franchised distributor is defined in part as:

> an individual . . . (or) corporation . . . with a place of business within the State, and engaged in the business of:
>
> (a) Purchasing . . . products which bear the trademark or trade name of the manufacturer . . . for the primary purpose of selling such products to retail outlets.

6 *Del.C.* § 2551(1)(a). Tippett contends that he was a franchised distributor within that definition because he had a place of business in the State of Delaware, and he was engaged in the business of "taking Bresler ice cream . . . for the purpose of selling such products to (his) licensees for retailing under the trade name" of Bresler's 33 Flavors. (Docket Item 7, p. 4). The factual record in this case, however, does not support Tippett's contention.

There was no direct testimony at trial concerning the location of Tippett's "place of business." Nevertheless, an implication can be drawn from the testimony and from the addresses used by the parties in their correspondence, that Tippett operated his business at his own home. (Tr. A–147, PX 19, DX 45). Tippett's home was located in Delaware throughout the time he acted as a T.L. (Tr. A–4, 94, C–155). The Court concludes, therefore, that Tippett did have a

---

29. The Delaware courts have recognized the Franchise Act as being an expression of the public policy of the State of Delaware. *Globe Liquor Co. v. Four Roses Distillers Co.*, 281 A.2d 19, 20 (Del.Sup.1971); *Paradee Oil Co. v. Phillips Petroleum Co.*, 320 A.2d 769, 775 (Del. Ch.1974), *aff'd*, 343 A.2d 610 (Del.Sup.1975).

30. Section 2555 also helps to establish the scope of the Franchise Act. 6 *Del.C.* § 2555. That section provides that the Franchise Act shall apply to all franchises in existence as of July 8, 1970 and all franchises which are renewed or executed thereafter. There is some question as to whether that section could be constitutionally applied to Tippett's T.L. Agree-

ment. *Compare, Globe, supra, with Paradee, supra.* This Court, however, does not find it necessary to resolve that question.

31. Obviously, the T.L. Agreement also governs the business relationship of the parties in Pennsylvania. Breslers contends that even if the Franchise Act is applicable, it nevertheless cannot be applied to the parties relationship in Pennsylvania. Docket Item 5, pp. 19–20. The Court expresses no opinion as to the merits of that contention. *See, Paradee Oil Co. v. Phillips Petroleum Co.*, 320 A.2d 769, 771, 775–76 (Del.Ch.1974), *aff'd*, 343 A.2d 610 (Del.Sup. 1975).

"place of business"[32] within the State throughout the period he acted as a T.L.

But in order to qualify as a franchise distributor under the Franchise Act, Tippett also had to prove[33] that he was "engaged in the business of purchasing . . products . . . for the primary purpose of selling such products to retail outlets." 6 Del.C. § 2551(1)(a). That subsection of the Franchise Act has been read by the Delaware Supreme Court to apply to "[a]ll wholesalers of trademark or trade name products." Globe, supra, 281 A.2d at 20.

■ Tippett argues that he meets the description contained in Section 2551(1)(a) because the T.L. Agreement essentially provided for a distributorship arrangement.[34] The problem with that argument is that it ignores the fact that the parties never operated in accordance with that portion of the T.L. Agreement. On the contrary, both parties testified that an arrangement was established, before Tippett opened any shops, whereby all the shops in his territory purchased all the ice cream they required directly from Richman. (Tr. A–55–60, C–149–152, E–154–155). Furthermore, that arrangement was utilized by all the shops in Tippett's territory throughout the time that Tippett acted as a T.L. (Id.). Thus, the record clearly indicates that Tippett was never "engaged in the business of purchasing . . . products . . . for the primary purpose of selling such products to retail outlets." Cf., Business Incentives Co. v. Sony Corp. of America, 397 F.Supp. 63, 68 (S.D.N.Y.1975). Instead he was engaged in the business of licensing others to sell[35] a trade name product in a retail outlet.[36] (Tr. A–17–18). On the basis of this factual record the Court concludes that Tippett was not a franchised distributor within the meaning of the Franchise Act[37] and that, therefore, the Franchise Act does not apply to the T.L. Agreement in question. Consequently, there does not appear to be any reason why this Court should not give effect to the choice of law clause contained in the T.L. Agreement.

## VI. THE BREACH OF CONTRACT CLAIM

Tippett also bases his claim for injunctive relief on common law contract principles. Under Illinois law Tippett would be entitled to an injunction if he proved: (a) that Breslers breached the T.L. Agreement when it terminated him; and (b) that there is no adequate remedy at law for that breach. Rao Elect. Equip. Co. v. Macdonald Engin. Co., 124 Ill.App.2d 158, 260 N.E.2d 294, 301 (Ill.App.1970); Madsen v. Chrysler Corp.,

32. "Place of business" is a somewhat ambiguous phrase. Since, however, there is no limiting definition for the phrase in the Franchise Act, the Court has assumed that an office and/or a residence can constitute a place of business within the meaning of the Franchise Act. Cf., N.J.Stat.Ann. § 56:10–3(f).

33. The parties disagree as to whether a franchised distributor would have the burden of proving that a termination was "without good cause" under the Franchise Act. 6 Del.C. § 2552; see Docket Item 42, p. 7 and Docket Item 43, p. 22. That question does not appear to have been clearly resolved in Delaware. Compare, Globe, supra, 281 A.2d at 21; with, Tulowitzki v. Atlantic Richfield Co., 396 A.2d 956, 960 (Del.Sup.1978); see also, Note, A Sui Generis Approach to Franchise Termination, 50 Notre Dame L.Rev. 545, 548 (1975); and Note, Constitutional Obstacles to State "Good Cause" Restrictions on Franchise Terminations, 74 Colum.L.Rev. 1487, 1492 n.56 (1974). The Court finds it unnecessary to resolve that question in the instant case. Nevertheless, the Court does hold that Tippett had the burden of proving that the Franchise Act applied to the T.L. Agreement. See, Chicago Bridge & Iron Co. v. Walker, 372 A.2d 185 (Del.Sup.1977).

34. It appears from the record that most of the other T.L.s did in fact act as distributors. (Tr. C–150, D–144–145).

35. Tippett had the right under the T.L. Agreement to set up and operate shops himself. (PX 1, § B(1)(B); Tr. A–145–147). There is nothing in the record, however, to suggest that he ever did so.

36. Tippett, thus, fits the definition of a franchisor under the Franchise Act. 6 Del.C. § 2551(2)(b).

37. The Franchise Act clearly could have been drafted in a manner that would cover someone like Tippett. See, 121½ Ill.Rev.Stat. § 703. The Delaware Legislature, however, did not choose to draft the Franchise Act that broadly.

261 F.Supp. 488, 507 (N.D.Ill.1966), *vac. as moot*, 375 F.2d 773 (C.A. 7, 1967). The next question the Court must decide is whether Tippett proved that Breslers breached the T.L. Agreement when it terminated him on August 14, 1978.

The T.L. Agreement gave Breslers the right to terminate Tippett if he failed to cure a material default within 30 days after having been given written notice of the default. A written notice of alleged defaults was given to Tippett on May 9, 1978. In addition, Tippett admitted at trial that he did not cure two of those alleged defaults within 30 days. Therefore, in order to prove that his termination in August was a breach of the T.L. Agreement, Tippett was obligated to prove that Breslers was precluded from relying on his failure to cure those defaults.

### A. *The Quota Default*

The first default Tippett admitted he did not cure within thirty days was his failure to have 27 shops open and operating as required by the quota provision. Tippett contends that Breslers cannot rely on that failure as a ground for terminating him, because Breslers had "waived" its right to enforce the quota provision. The Court agrees.

■ Waiver is a term that is used by courts and attorneys to refer to a variety of legal principles. *See*, 5 Williston on Contracts § 676 (3rd ed. 1961); 3A Corbin on Contracts § 752 (2nd ed. 1960) (hereinafter cited as "*Corbin*"). The type of "waiver" that is claimed to have occurred in this case is that which arises when a party to a contract learns of a breach by the other party that gives him the right to terminate the contract and he does not exercise his right to do so within a reasonable period of time. Such a decision to continue with the contract is viewed by the Illinois courts as a waiver of the right to terminate the con-

tract on that ground. *Housing Authority for La Salle County v. Little*, 64 Ill.App.3d 149, 21 Ill.Dec. 25, 380 N.E.2d 1201, 1202 (1978); *Jacobs v. Carroll*, 46 Ill.App.3d 74, 4 Ill.Dec. 389, 360 N.E.2d 136, 142 (1977); *Bartels v. Denler*, 30 Ill.App.3d 499, 333 N.E.2d 640, 642 (Ill.App.Ct.1975); *Waukegan Times Theater Corp. v. Conrad*, 324 Ill.App. 622, 59 N.E.2d 308, 312 (1945). Moreover, in the case of a continuing breach an initial waiver will continue to preclude a termination on the ground waived unless and until clear notice is given that compliance with the contract will be insisted upon in the future and a reasonable period of time is specified during which the defaulting party will be given an opportunity to comply. *Doerr v. Maher*, 337 Ill.App. 245, 85 N.E.2d 363, 364 (1949); *Barnard v. Hollingsworth*, 336 Ill.App. 228, 83 N.E.2d 372, 374 (1948); *Burch v. Hickman*, 330 Ill.App. 155, 70 N.E.2d 421 (1946); *see also* 3A *Corbin* § 764.

■ In the present case, Tippett was required by the quota provision of the T.L. Agreement to open 27 shops within six years. After the sixth year Tippett's obligation changed to one of simply maintaining 27 shops in operation. Tippett had clearly defaulted on both of those obligations by the end of his seventh year of operation, and Breslers was aware of those defaults. Breslers did not choose to terminate him for those defaults during those seven years. In fact, the president of Breslers told Tippett during that period that the quota provision would not be strictly enforced. The Court concludes, therefore, that by the end of the seventh year of Tippett's term Breslers had waived its right to terminate him on the basis of either the annual or the cumulative quota defaults.[38]

The Court also concludes that the waiver of that right continued to the time that Tippett was terminated, because Breslers

---

**38.** The T.L. Agreement did contain a clause which provided that:

> [f]ailure of (Bresler) to notify (Tippett) of any default . . . or to cancel and terminate this Agreement . . . shall not constitute a waiver of any such default, nor shall it constitute a consent, acquiescence or waiver of any later defaults whether of the same or a different character.

(PX 1, § F(2)). Nevertheless, the Court concludes that Illinois courts would give no effect to the above clause in the circumstances of this case. *Doerr v. Maher*, 337 Ill.App. 245, 85 N.E.2d 363, 364 (1949); *Waukegan Times Theater Corp. v. Conrad*, 324 Ill.App. 622, 59 N.E.2d 308, 312 (1945); *see also* 3A *Corbin* § 763.

never gave Tippett clear notice that they would no longer tolerate his defaults and that he would be expected to meet his contract quota within a specified reasonable period of time. Breslers did issue a general letter to all of the T.L.s concerning the failure of many of them to meet their quotas. That letter, however, was not the type of clear notice that is needed in order to eliminate a waiver. On the one hand the letter warned the T.L.s that Breslers' policy of being "lenient" with respect to quota defaults would not continue, and on the other hand, it assured them that Breslers would not be "capricious with respect to that type of default." In addition, the letter did not inform Tippett that he had to meet his quota within a specified reasonable period of time; it simply stated that Breslers would be closely evaluating each T.L.'s progress toward achieving his own quota. Finally, whatever impact that letter might have had as a notice was diluted by Breslers' offer to re-evaluate each T.L.'s quota.

The only other notice concerning the quota defaults that Breslers ever sent to Tippett was the May 9th default notice. That notice was not effective to eliminate the waiver because it gave Tippett only thirty days in which to meet his quota. Such a short period of time was clearly unreasonable in view of the nature of the default and the extent of the past waivers. Consequently, the Court concludes that Breslers may not rely on Tippett's failure to cure the quota defaults as a justification for the termination of his T.L. Agreement.

## B. The Conformance Default

The second default that Tippett admitted he did not cure within thirty days was his failure to take the necessary steps to force the shop owners in his territory to cease using non-imprinted paper goods and unapproved toppings. Tippett contends that Breslers is also precluded from relying on that failure as a ground for terminating him. He contends that this default was not material because most of the shops in his territory were using imprinted paper goods and approved toppings by the time he was actually terminated.

The record does not clearly indicate the extent of the conformance problem between the date of the default notice and the date of the termination. It does indicate, however, that at the date of the termination at least one shop was still using a full line of non-imprinted goods and unapproved toppings and that at least one-third of Tippett's other shops were using some non-imprinted goods and unapproved toppings. The question then is whether Tippett's failure to take the necessary steps to force those shops to cease using the unapproved items was a material default.

■ The Court concludes that it was. Both parties agreed that the use of imprinted paper goods and approved toppings by the individual shop owners is an extremely important part of a franchise system like Breslers. Tippett himself testified that the use of non-imprinted goods by a shop owner would have some adverse affect upon the sales of all the shops in his territory. (Tr. D–17–18). Therefore, Tippett's failure to take the necessary steps to force several of his shop owners to cease using unapproved items within 30 days after a notice to do so was a material default which gave Breslers the right to terminate him.

## C. The Bad Faith Claim

■ Tippett argues, however, that even if he was in material default, Breslers nevertheless breached the T.L. Agreement when it terminated him. That argument is based on the following three contentions: (a) that an implied duty of good faith was a part of the T.L. Agreement; (b) that a termination which was based on a desire to appropriate Tippett's territory would violate that implied duty; and (c) that Breslers' decision to terminate him was motivated primarily by a desire to appropriate his territory, rather than by a concern with any defaults that existed. The first of those three contentions is clearly correct. *See, Martindell v. Lake Shore National Bank*, 15 Ill.2d 272, 154 N.E.2d 683, 690 (1958); *Stevenson v. ITT Harper, Inc.*, 51 Ill.App.3d 568, 9 Ill.Dec. 304, 366 N.E.2d 561, 567 (1977); *Pierce v. MacNeil Memorial Hospi-*

*tal Ass'n*, 46 Ill.App.3d 42, 4 Ill.Dec. 615, 360 N.E.2d 551, 558 (1977). In addition, the Court is willing to assume, for the purpose of this decision, that the second contention is also correct. *See, Pierce, supra*, 4 Ill.Dec. at 621, 360 N.E.2d at 558. The third contention, however, is not supported by the record in this case.

Mr. McGuire, the president of Breslers testified that Breslers did not terminate Tippett because of a desire to take over his territory. (Tr. E–106). He testified that Tippett was terminated because during the last few years he had lost his commitment to the Breslers program and was either unwilling or unable to open a significant number of new shops, or to take the necessary steps immediately to eliminate conformance problems that were present in the existing shops. (Tr. E–119, 147, 158). Mr. McGuire further testified that Tippett had not been terminated earlier because there were other T.L.s "who were creating more of a problem with the program and their removal was more imminent." (Tr. E–149). The Court concludes that Mr. McGuire's testimony is credible.

The record clearly indicates that Tippett had lost his commitment to the Breslers program. Tippett's own testimony at trial and his letters to Breslers over the last few years overwhelmingly demonstrate that he had come to believe that the Breslers program was failing and needed to be changed. The record also indicates that as a result of this belief Tippett essentially refused to open shops in outside locations and he resisted Breslers' attempts to get him to take immediate action against the shop owners in his territory that were not in conformance with the Breslers program. Finally, the record indicates that there were some T.L.s who were worse than Tippett, and that at least a few of those T.L.s were terminated or left the program as the result of litigation prior to the date of Tippett's termination. (Tr. B–83, 84, E–150).

Nevertheless, Tippett argues that there is also evidence in the record from which an inference could be drawn that Breslers acted in bad faith when it terminated him. The first fact upon which he relies is that Breslers did not inspect his territory before it issued the final default notice or before it issued the termination letter. In other circumstances that fact might support an inference that an improper motive was involved. In the present case, however, it does not support such an inference.

The record indicates that an inspection of Tippett's territory was made in late January and early February of 1978. (DX 50). Following that inspection Breslers wrote Tippett a letter which detailed the various problems that had been discovered during the inspection and warned him that if he did not correct those problems he would be placed in default. (DX 8). Tippett's response to that letter clearly indicated that he would not correct all of those problems as demanded by Breslers. (PX 86). Breslers then issued the final default notice. The only defaults cited by Breslers in that notice were the problems that Tippett had indicated he would not correct. (PX 18). Tippett's response to the final default notice also clearly indicated that he would not comply with Breslers' demand that the defaults be cured. (PX 19). Mr. McGuire testified that he believed Tippett's statement that he would not cure all of the problems and therefore the termination letter was issued. (Tr. E–157–158). The record thus indicates that no reinspection was made because Tippett had made a reinspection unnecessary by affirmatively notifying Breslers that he would not cure the defaults as demanded.

The second fact that Tippett relies upon to show an improper motive is the fact that shops in some other territories also used non-imprinted paper goods and unapproved toppings at various times and yet the T.L.s in those territories had not been terminated. The record is unclear to what extent there were conformance problems in other areas of the country. There is no doubt, however, that conformance problems did exist in some other areas of the country and that the T.L.s in some of those areas were not terminated as a result of those problems. (Tr. D–130, E–35, 145). Nevertheless, that fact does not support an inference of bad faith.

Tippett was not terminated because some of the shop owners in his territory used unapproved items. He was terminated because he affirmatively refused to take the necessary steps to force the shop owners in his territory to cease using unapproved items. (Tr. E–147, 158). There is no evidence in the record to suggest that any other T.L. had affirmatively resisted Breslers and refused to enforce the franchise program and yet had not been terminated. The Court therefore concludes that Breslers did not act in bad faith when it terminated Tippett and that consequently they did not breach the T.L. Agreement.

In summary, the Court concludes that the Franchise Act is not applicable to the present case, and that Breslers did not breach the T.L. Agreement when it terminated Tippett.

An Order will be entered in accordance with this Opinion.