Albert METZKER, Plaintiff,

v.

INTERNATIONAL PAPER COMPANY,
Defendant.

Civ. A. No. 92–404–JLL.

United States District Court,
D. Delaware.

June 17, 1993.

James F. Bailey and Brian Thomas McNelis, Bailey & Wetzel, P.A., Wilmington, DE, for plaintiff.

Olha N.M. Rybakoff, Connolly, Bove, Lodge & Hutz, Wilmington, DE, and Patrick W. Kittredge and Christine Councill Fritton, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

Defendant, International Paper Company, ("IPC") has brought this motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking partial summary judgment in its favor on the six claims of plaintiff, Albert Metzker, which are based on IPC's early termination of its lease.[1] (Docket Item ["D.I."] 26.) IPC claims that its early termination fell within Article XXVI of the lease which permits early termination by the lessee under certain circumstances. Plaintiff claims that defendant's use of the early termination clause was improper. For the reasons set forth below, this Court finds that defendant's use of the early termination clause was proper, and, accordingly, this Court will grant summary judgment to defendant on all six of plaintiff's claims which are based on defendant's early termination.

Plaintiff is a citizen of Atlanta, Florida. Defendant is a New York corporation with its principal place of business also in New York. The amount in controversy exceeds $50,000.00 exclusive of interest and costs. (D.I. 3.) Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

### II. FACTS

Plaintiff is the owner of a parcel of commercial property located at 200 South Madison Avenue, Wilmington, Delaware, which is the subject of the lease agreement at issue in this case. (D.I. 3.) It is apparently undisputed by the parties that in June of 1980, Hammerhill Paper Company which has now merged into International Paper Company[2] entered into a written lease agreement with plaintiff for the premises at 200 South Madison Avenue. (D.I. 28 at A–1 ¶ 2.) In July of 1989, the parties to the 1980 lease agreed in writing to amend and extend that lease to May of 1992. In June of 1990, plaintiff sent a letter to defendant suggesting that the parties negotiate a "longer lease" at "a better deal." (D.I. 28 at A–5.)

The parties negotiated and on January 9, 1991, Metzker and IPC signed a lease which stated that its term would be "three (3) years, beginning September 1, 1990, and ending August 31, 1993 together with any extensions thereof permitted hereunder." (D.I. 28 at A26.) It is undisputed that the January 9, 1991 lease was in effect when defendant terminated the lease and it is also undisputed that the January 9, 1991 lease included an early termination provision which read as follows:

---

1. Plaintiff's complaint alleges eight breaches of the lease. Six of those alleged breaches are based on IPC's early termination and thus will be treated together for the purposes of this motion. Those six claims are that defendant breached the lease in that it:

    (1) violated the provisions of Article I of the lease by failing to pay rent after March 31, 1992;
    (2) violated the provisions of Article IV of the lease by failing to pay utility charges commencing April 1, 1992 to the end of the lease term;
    (3) violated Article V by failing to pay taxes;
    (4) violated the provisions of Article VI of the lease by failing to maintain insurance coverage on the premises;
    (5) violated the provisions of Article XIV of the lease by defaulting and by abandoning the premises;
    (6) violated the provisions of Article XXVI of the lease by the wrongful termination of the lease.

    (D.I. 3.; D.I. 27.) The remaining two claims are unrelated to the early termination and are not

the subject of this motion. In those latter two claims, plaintiff seeks recompense for damage done by defendant to gutters and spouts in violation of provisions of Article II of the lease and for damages caused by defendant's failure "to promptly make all necessary repair, replacements and/or renewals after demand," (D.I. 3), in violation of Article IX of the lease. Plaintiff claims damages for those two violations in the amount of $28,622.00; defendant admits it owes plaintiff $2,900.00 on those claims. (D.I. 27 at 3.)

2. In 1980 Hammerhill Paper Company acquired Advance Paper and Chemical Company from plaintiff. The present record does not consistently distinguish between Hammerhill, Advance, or IPC. However, it is clear that IPC is the named lessee of the lease agreement at issue and IPC is the named defendant. Since neither this Court nor either of the parties finds any relevance in distinguishing the companies for the purposes of this motion, the Court will hereinafter refer only to the named defendant IPC when discussing the involvement of IPC, Hammerhill or Advance in the lease agreements.

## Article XXVI

### Early Termination by Lessee

Lessee [IPC] presently utilizes approximately 15 parking spaces, on land owned by a third party, immediately in front of the building on the Leased Premises. Should said third party, its successors or assigns, at any time during the lease require Lessee to discontinue use of this space, totally or in part, then at lessee's option, upon thirty (30) days written notice to Lessor [Metzker], this Lease shall terminate, and thereafter be null and void.

(D.I. 28 at A39–40.)

In addition, there is undisputed evidence that in negotiating the lease in question, plaintiff took issue with the early termination provision and proposed a change which would have permitted him to provide alternative parking in the event that the fifteen spaces listed in Article XXVI became unavailable.[3] It is also undisputed that plaintiff's change was expressly rejected by defendant. On January 4, 1991, defendant's counsel, John P. Fonzo, sent a letter along with the final version of the lease to plaintiff. That letter stated in relevant part:

I believe that this Lease addresses two of the concerns that you expressed.... Your third concern, early termination by Lessee (Article XXVI) has been retained as originally drafted by International Paper, as the fifteen (15) parking spaces to be provided by you, in the event that the existing spaces are no longer available, cannot be guaranteed as to suitability and proximity to 200 South Madison Street.

(D.I. 28 at A24.) As stated *supra*, the lease to which the above letter referred and which both parties executed on January 9, 1991, did not contain plaintiff's proposed change.

Defendant contends that the fifteen parking spaces referred to in the lease, were located in a fenced-in lot owned by the City of Wilmington which was situated fifty feet from the front door of the Leased Premises. (D.I. 27 at 6.) It is undisputed that the defendant did use those spaces and that on August 7, 1991, a representative of the City of Wilmington's Department of Commerce notified defendant that defendant would no longer be able to use that parking as the City had determined that it needed the lot for the parking of automobiles seized by the Wilmington Police Department. (D.I. 28 at A90.) In early October, 1991, the City did reclaim its lot and locked the gate to it. Between the time the City notified defendant of its intention to reclaim and the time it actually did reclaim the lot, the City and defendant worked out an arrangement for temporary alternative parking. That arrangement allowed defendant to park in the Delmarva Power Company lot for eight weeks beginning in October, 1991. (D.I. 28 at A42.)

On November 25, 1991, or December 1, 1991,[4] defendant sent plaintiff a letter which stated in relevant part:

We were recently notified by the party who had permitted us to utilize fifteen (15) parking spaces in front of the Advance Paper facility, [the Leased Premises] that we will no longer have the use of the same.

Thus, notice is hereby given, pursuant to Article XXVI of the January 9, 1991 Lease between you and International Paper, that International Paper exercises its right to terminate the Lease. As finding a suitable alternative location and relocating will take some time, we will give you thirty (30) days notice in advance of vacating the premises.

---

**3.** The evidence includes Metzker's own deposition testimony (D.I. 28 at A110–11); the draft of the lease with Metzker's handwritten proposed change (D.I. 28 at A22); the letter, quoted *infra*, from defendant's counsel, John P. Fonzo, dated January 4, 1991, stating that defendant would accept all of Metzker's proposed changes to the lease agreement except the one concerning the early termination provision (D.I. 28 at A24); and finally, the lease with the early termination provision dated January 9, 1991 and signed by Metzker and IPC (D.I. 28 at A39–40).

**4.** The letter itself appears to be dated November 25, 1991, (D.I. 28 at A77), but later reference to the letter refers to the date as December 1, 1991 (D.I. 28 at A79). Since the timing of the notice given under the early termination provision is not at issue in this case, the question of whether the letter was effective on November 25 or December 1 of 1991 is immaterial.

(D.I. 28 at A77.) On February 17, 1992, defendant sent plaintiff another letter, referencing the one cited above, which stated in relevant part: "The purpose of this letter is to notify you that Advance Paper (International Paper) will be vacating the premises on March 31, 1992." (D.I. 38 at A79.)

IPC did terminate its lease effective March 31, 1992. The only issue presently before this Court is whether IPC's termination represented a breach of the lease agreement or was in accord with the Article XXVI early termination provision.

## III. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Rules 56(a) and 56(d) of the Federal Rules of Civil Procedure provide that summary judgment may be granted on specified issues, while the remainder of a case proceeds to trial. The proper inquiry for determining whether summary judgment is appropriate is whether there is a need for a trial. "In other words, [are] there any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Supreme Court has held that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249–50, 106 S.Ct. at 2511. (Citation omitted.)

## IV. CHOICE OF LAW

A Federal District Court sitting in diversity must apply the choice-of-law rules of the state in which it sits to determine which state's substantive law governs the controversy before it. *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Therefore, this Court must apply the State of Delaware's choice-of-law rules. Delaware courts apply the modern "most significant relationship" test of the Restatement (Second) of Conflicts § 188 (1971) [5] to resolve conflicts issues arising out of the interpretation and validity of contracts. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del.1991). That approach "indicates that the laws of the jurisdiction which had the most significant relationship to the transaction and parties would control the substantive legal questions." *National Union Fire Ins. Co. v. RLC Corp.*, 449 A.2d 257, 261 (Del.Super.1982), *app. den. RLC Corp. v. National Union Fire Ins. Co.*, 454 A.2d 765 (Del.1982).

The contacts to be taken into account by a court determining which jurisdiction has the most significant relationship to the transaction in a contract case are: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location and subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. "These contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflicts § 188(2) (1971). *See also, Playtex Family Products, Inc. v. St. Paul Surplus Lines Ins. Co.*, 564 A.2d 681, 688–89 (Del.Super.1989). The comment to subsection (2) of § 188 of the Restatement gives guidance on the rela-

5. The "most significant relationship test," requires a court to determine which state has the most significant relationship to the matter at hand by considering the following factors:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
Restatement (Second) of Conflicts § 6, § 188 (1971).

tive importance courts should assign to each factor with respect to particular issues, specifically stating that the situs of the subject matter of the contract should be given great weight in contracts which involve land.

> *Situs of the subject matter of the contract.* When the contract deals with a specific physical thing, such as land or a chattel ... the location of the thing ... is significant. The state where the thing ... is located will have a natural interest in transaction affecting it. Also the parties will regard the location of the thing ... as important. Indeed, when the thing ... is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law [6] of the place where the thing ... was located would be applied to determine many of the issues arising under the contract.

Restatement (Second) of Conflicts § 188 comment on subsection (2) (1971).

■ Thus, according to the Restatement, since the lease at issue is a contract concerning land,[7] and since Delaware is the situs of the land which is the subject of the lease, Delaware law should be applied in this case. The parties are apparently in agreement that Delaware law should govern this case. Defendant expressly addressed the choice-of-law issue in its brief, stating that since both the place of performance and the location of the subject matter of the contract were in Delaware, Delaware had the most significant relationship to the transaction and thus Delaware substantive law should govern the issues in the case. Plaintiff has never addressed the choice-of-law issue nor defendant's discussion of it. Nevertheless, plaintiff has cited predominantly Delaware law in his brief. Apparently, plaintiff does not contend that any other state has a more significant relationship with the transaction than Delaware. Accordingly, this Court finds that Delaware has the most significant relationship to the transaction and thus this Court

will apply Delaware substantive law, as mandated by Delaware's choice-of-law rules, to the issues concerning the interpretation and validity of the contract.

## V. DISCUSSION

■ As stated *supra*, the only issue presently before this Court is whether the early termination provision of Article XXVI of the lease permitted defendant to terminate the lease when it did. Accordingly, the only question before the Court is one of contract interpretation. "Interpretation of language in a contract, although 'analytically a question of fact, is treated as a question of law both in the trial court and on appeal.'" *Watkins v. Beatrice Cos., Inc.*, 560 A.2d 1016, 1021 (Del.1989) (quoting *Klair v. Reese*, 531 A.2d 219, 222 (Del.1987) (citing Restatement (Second) of Contracts § 212, comment d (1981)).

Delaware law is clear on the role courts are to play in the interpretation of contracts. The Delaware Supreme Court has stated:

> The correct interpretation of a contract primarily focuses upon the search for the "common meaning of the parties, not a meaning imposed on them by law".... Furthermore, "in the absence of ambiguity there is no room for construction." ... Hence, the court will recognize the "plain meaning" of language used in a contract when there is a "general prevailing meaning and there is no evidence that the parties intended the language to have any other meaning."

*Watkins*, 560 A.2d at 1021 (citations omitted).

The majority of plaintiff's arguments[8] urge this Court to apply certain equitable doctrines which would modify the effect of the lease. In short, most of plaintiff's arguments contend that although the lease states what defendant contends it states, equity should prevent defendant from utilizing the early termination provision as written, under the present circumstances. For the reasons

---

6. Local law refers to the state's substantive law rather than to the state's choice-of-law rules.

7. Accordingly, this opinion alternates between the terms lease and contract when discussing the January 9, 1991 lease agreement.

8. As discussed, *infra*, it is not clear to this Court whether plaintiff's first argument is actually an argument or a summary of the standard of review.

stated below, this Court finds that the equitable doctrines cited by plaintiff are inapplicable to the case at hand. The Court will address plaintiff's arguments *seriatim.*

### A. Plaintiff's First Argument: "Standards of Court Review for Partial Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure."

In the section of plaintiff's brief which is devoted to what plaintiff has labelled as his argument on the standard of review, plaintiff merely states what he believes is the applicable standard of review for summary judgment, without ever applying that standard to the facts of this case. In other words, plaintiff provides the Court with a proposed statement of law not with an argument.[9] As a result, even if the Court were to give the plaintiff the benefit of the doubt and assume that he included the standard for summary judgment under the title "argument" to signify a contention that summary judgment would be inappropriate in this case, the Court would still not know what support plaintiff would claim for such a contention.

In addition, if this Court were to give plaintiff further benefit of the doubt and assume that if he is objecting to summary judgment he is doing so because he believes there is a material issue of fact, the Court would still find his argument groundless since, for the reasons stated below, the Court finds that there are no factual elements in dispute in this case.

The Supreme Court has held that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon a motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Discovery is closed in this case. Accordingly, the Court is in a position to determine whether plaintiff has made a showing sufficient to establish any elements essential to his case. In addition, most of the issues in this case concern the interpretation of contracts which are questions of law not questions of fact.[10]

9. The Court uses the terms "believes" and "proposed" because the Court is of the opinion that plaintiff errs in his understanding of the standard itself. Since plaintiff never applies the standard to the case at hand it is difficult to be certain whether or not he is in error, however, plaintiff has quoted a section of a Third Circuit opinion from 1973, *Hopewell Township Citizens I–95 Committee v. Volpe,* 482 F.2d 376 (3d Cir.1973), the interpretation of which this Court finds is severely modified by the two 1986 Supreme Court decisions in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Specifically, plaintiff cites *Hopewell* for the proposition that "the Court may not grant summary judgement unless the case is free from doubt, all doubts being resolved against the moving defendant." (D.I. 29 at 5.) *Celotex* and *Anderson* shift a court's focus away from the amorphous concept of "doubt" to the familiar concepts of sufficiency of the evidence, materiality of facts, and establishment of elements of a claim. *Celotex* specifically mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. *Anderson,* in turn, states that the standard for summary judgment "mirrors the

standard for a directed verdict under Federal Rule of Civil Procedure 50(a)." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

10. Summary judgment is appropriate in two different types of situations. The first, and simplest, is when an issue is clearly a question of law rather than of fact, and thus is for the Court rather than the fact-finder to decide. Questions of statutory interpretation, like questions of contract interpretation, fit squarely into this category.

The second category of claim which is appropriate for summary judgment can involve issues of fact. *Anderson* and *Celotex* instruct that even when evidence has been offered on contested factual issues those issues may still be ripe for summary judgment. Summary judgment may be appropriate because the question of whether or not sufficient evidence has been produced from which a reasonable juror could return a verdict in favor of the non-moving party is itself a question of law for the Court to decide. The Federal Rules of Civil Procedure permit a Court to make such a determination on the sufficiency of the evidence at the summary judgment stage (Fed. R.Civ.P. 56) or upon motion for a judgment as a matter of law (Fed.R.Civ.P. 50) made either at the close of plaintiff's case (formerly a motion for a directed verdict), or post-trial (formerly a motion for judgment notwithstanding the verdict (j.n.o.v.)).

Finally, the only argument advanced by plaintiff which might involve a determination of fact is plaintiff's second argument which states that the event which the contract specifies as triggering the early termination provision of Article XXVI has not occurred. This Court finds that the plaintiff is in fact arguing that the contract's definition of the triggering event is ambiguous rather than that there is a question of fact concerning the occurrence of the event. For reasons discussed *infra*, the Court finds that the contract provision is not ambiguous. In addition, as discussed *infra*, plaintiff has introduced no evidence from which a reasonable juror could find that the triggering event had not occurred. Accordingly, summary judgment is appropriate and will be granted to defendant.

## B. Plaintiff's Second Argument: The Event Described In Article XXVI Of The Lease Has Not Taken Place.

■ Plaintiff's second argument states that the event which triggers the early termination provision pursuant to the lease has not yet occurred. Plaintiff does not dispute that defendant is no longer able to utilize the fifteen spaces it previously utilized in the fenced-in lot owned by the City of Wilmington which was located across the street from the Leased Premises (hereinafter the "City lot"). Instead plaintiff argues as follows:

the Lease requires fifteen spaces across from the leased premises, on the property of a third party. No reference is made in this language to spaces within the fenced area, despite the fact that it would have been simple to include said language. Over fifteen spaces are available for use by the Lessee which are immediately in front

of the leased premises, and which are on land owned by a third party. Spaces are available along the outside of the fenced area, in the shoulder, across the street from the leased premises. The Lessee regularly used these spaces during the course of the rental period.... These spaces fall squarely into the description in Article XXVI of the Lease. Thus, the defendant has not lost the spaces described in this provision of the lease.

(D.I. 29 at 7–8.)

Defendant contends that the parking referred to in Article XXVI of the lease was the parking in the City lot which became unavailable.[11] Defendant has offered uncontroverted evidence that the fifteen spaces referred to in Article XXVI of the lease were the fifteen spaces in the City lot which are undisputedly no longer available. Defendant's uncontroverted evidence consists of the affidavit of Raymond J. Huelskamp,[12] one of the parties who negotiated the lease for defendant, and plaintiff's own deposition testimony. Huelskamp's affidavit states that he and John P. Fonzo, Esq., negotiated the lease on defendant's behalf and that the fifteen parking spaces referred to in Article XXVI of the lease were indeed the fifteen spaces in the City lot, which are now no longer available. Plaintiff's own deposition testimony states that at the time he signed the lease he did not know where the fifteen spaces referred to in Article XXVI were located and he did not ask defendant to specify their location. (D.I. 28 at 116.)

This Court will not transform plaintiff's failure to fully inform himself when signing a contract into an ambiguity or a mistake.

Certain questions arising in contract cases, like the one at hand, create a hybrid of the two situations. The very provision which the court is asked to interpret is triggered by the occurrence of a particular event. While interpreting the provision is a question of law for the Court, determining whether the event actually occurred can be a question of fact. However, as such, it may still be appropriate for summary judgment, if insufficient evidence has been produced by the party bearing the burden of proof.

11. In addition, defendant contends and has offered substantive evidence to support its contention, that the parking referred to by plaintiff as

being still available and meeting the descriptions of the lease, was, in fact, illegal and unsatisfactory. Since the Court finds that the parking referred to in Article XXVI was the parking in the City lot, the Court finds the issue of suitable alternative parking irrelevant.

12. Huelskamp's affidavit, dated March 9, 1993, states that he was the president of Advance Paper from July, 1989 until March 31, 1992 and that he is currently the Director of Marketing for the Industrial Business, International Paper Distributing Group. (D.I. 28 at A41.)

Merely because plaintiff was not interested in knowing the exact location of the fifteen spaces does not mean the contract was ambiguous concerning their location.[13] Under the terms of the contract, only the lessee, defendant, could utilize the early termination provision, and the lessee could only do so if a particular set of parking spaces which he had been utilizing became unavailable. Such a clause makes clear that a more specific definition of those spaces was within the defendant's possession and the availability of those spaces was in neither the defendant's nor the plaintiff's control. Accordingly, if the exact location of those spaces were of any importance to the plaintiff he could have ascertained it from defendant before signing the contract. The fact that plaintiff did not inform himself of the exact location of the spaces mentioned in Article XXVI merely means that since it was the availability rather than the location of those spaces which was the key factor for termination purposes, their location was immaterial to his signing the contract. Immateriality of a term does not constitute ambiguity of a term.

The Court finds that the language of the early termination provision is not ambiguous. That provision permits termination if a particular set of parking spaces which the lessee (defendant) had been utilizing became unavailable. Defendant has offered unrefuted evidence demonstrating that the reference to the fifteen parking spaces was, in fact, a reference to the fifteen spaces in the City lot. Since plaintiff has offered no evidence to contradict that offered by defendant, no reasonable juror could find for plaintiff, and, accordingly, defendant is entitled to summary judgment.

## C. Plaintiff's Third Argument: Defendant Accepted The Use Of Alternate Parking And Waived Their Right To Terminate The Lease Under Article XXVI.

Plaintiff's third argument states that because defendant employed other parking in addition to the fifteen spaces at issue and because defendant attempted to find suitable replacement parking for the fifteen spaces once those spaces became unavailable,[14] defendant has somehow waived its right to terminate the lease under the early termination provision. Plaintiff bases his contention that this action on defendant's part constitutes waiver on the following statement of law which is on its face inapplicable to the factual situation at issue in this case:

> [W]hen a party to a contract learns of a breach by the other party that gives him a right to terminate, and he does not exercise his right to do so within a reasonable period of time.... such ... is viewed ... as a waiver of the right to terminate the contract on that ground. *33 Flavors of Greater Delaware Valley, Inc. v. Bresler's*

13. There is also no evidence that plaintiff signed under a mistaken impression that the clause meant something other than what defendant is now arguing. Plaintiff is not arguing that he signed the lease with an erroneous understanding that the fifteen spaces referred to in Article XXVI, were a different fifteen spaces than those now at issue. Plaintiff states in his own deposition testimony that he did not know where the fifteen spaces were located. Accordingly, there was no mistake.

14. As stated *supra,* it is undisputed that defendant did utilize space in a lot owned by the Delmarva Power & Light Company for a short period of time after the City lot became unavailable. While defendant has submitted evidence showing that the Delmarva lot was an inconvenient and dangerous distance from its premises, and plaintiff has refuted that assertion, the Court finds the Delmarva lot's suitability to be irrelevant. The Court finds that the lease did not condition early termination on the unavailability of suitable parking, but rather on the unavailability of the fifteen spaces in the City lot. In fact, as stated *supra,* during the negotiations of the lease, plaintiff attempted to modify the termination clause to allow for suitable replacement parking, and defendant specifically rejected the modification stating that the replacement parking clause was unacceptable because replacement parking could not "be guaranteed as to suitability and proximity to 200 South Madison Street." (D.I. 28 at A24.) In other words, the negotiations make it clear that defendant's main reason for rejecting plaintiff's modification was that defendant wanted to be in complete control of the determination of suitability. The early termination clause, as signed, gave defendant that control by making the loss of the fifteen spaces, rather than the failure to find suitable replacements the triggering event for early termination. Accordingly, suitability of alternative parking is not an issue in this case.

*33 Flavors, Inc.,* 475 F.Supp. 217, 229 (D.Del.1979).[15]

Plaintiff's cite has no application to the present case since the present case does not involve termination based upon a breach of contract by plaintiff, but rather involves termination based upon the occurrence of an independent event specified in the contract. In short, the present termination is not the result of a breach in the contract but rather is in accord with the very terms of the contract.

### D. Plaintiff's Fourth Argument: Plaintiff Could Not Have Prevented The Loss Of The Fenced In Parking Area and Defendant's Continued Duty Under The Lease Does Not Represent A Substantial Burden.

Plaintiff's fourth argument is apparently based on the same misconception as his waiver argument. Plaintiff's fourth argument contends that because plaintiff could not have prevented the unavailability of the fifteen parking spaces, and because defendant is not unduly burdened by that unavailability, defendant can not terminate the lease. Again, defendant's termination is based on an express provision of the contract; it is neither a breach by defendant, nor a termination in response to a breach by plaintiff. Article XXVI of the lease specifically allows for early termination by *only the defendant,* and only upon the occurrence of an event which is in control of neither plaintiff nor defendant. Accordingly, neither plaintiff's "blame" nor defendant's "burden" are relevant.

Plaintiff's blame for the occurrence of the triggering event is irrelevant because the contract never anticipated that plaintiff would have any control over that occurrence. In fact, plaintiff's lack of control over the parking situation was anticipated by both parties during the negotiations of the contract. If plaintiff had had control over the parking at question he could have guaranteed it in the lease and the early termination provision would have been unnecessary. In essence, plaintiff's lack of control over the parking situation was the very reason for defendant's insistence on including the early termination provision in the lease.[16]

Defendant's burden in finding or utilizing alternative parking is also irrelevant because the lease negotiations make it clear that whatever the burden was, it was more than that to which the defendant was willing to agree. As defendant's rejection of plaintiff's proposed modification of the provision made clear, the perceived burden was substantial enough to defendant to cause it to make the early termination provision a non-negotiable item. As a result the language of the lease specifically provides for defendant's terminating upon the occurrence of the specified event regardless of the difficulty or ease with which alternative parking could be acquired.

Defendant's ability to terminate should the parking it previously enjoyed become unavailable was a condition of the lease which the two parties freely negotiated. Accordingly, this Court will uphold the provision as written.

### E. Plaintiff's Fifth Argument: International Paper Used The False Issue Of Parking Spaces To Terminate The Lease With Plaintiff For Economic Reasons.

Plaintiff's final argument contends that defendant did not operate in good faith when it terminated the lease because its real reasons for terminating were economic and unrelated to the loss of the availability of the parking spaces. In support of this argument plaintiff

15. Plaintiff's brief correctly notes that in the *Bresler* decision this Court was interpreting Illinois law. In fact, the quotation chosen by the plaintiff read in pertinent part: "Such a decision to continue with the contract is viewed *by the Illinois courts* as a waiver ..." *Bresler,* 475 F.Supp. 217, 229 (emphasis added). The plaintiff fails, however, to state what relation, if any, Illinois has to the transaction at issue. Since the Court finds the proposition itself inapposite the Court need not guess at plaintiff's assertions concerning the application, authority or analogous nature of Illinois law.

16. Defendant's counsel's letter to plaintiff rejecting his proposed change in the early termination provision said as much when it stated that alternative parking provided by plaintiff would be unacceptable because it could not "be guaranteed as to suitability and proximity to 200 South Madison Street." (D.I. 28 at A24.)

cites *Elizabethtown v. Coca–Cola, Co.,* 668 F.Supp. 906 (D.Del.1987), in which this Court stated:

> The duty of good faith is a contract term implied by the Courts under the common law to prevent one party from unfairly taking advantage of another party.... It is possible ... that the exercise of an express power would constitute a breach of the duty of good faith if the external circumstances demonstrate, for example over-reaching or undue interference in the other party's performance.

*Id.* at 918, 920.

Plaintiff has again cited authority which is inapposite. The passage cited above is specifically addressed to situations in which one party acts in bad faith to precipitate the other party's breach. The Court states that breach of the implied duty of good faith occurs "if the external circumstances demonstrate ... over reaching or undue interference in the *other party's performance." Id.* (emphasis added). Again, the event which permitted early termination in this case was completely unrelated to either party's performance. Thus, if the event which permitted early termination occurred, and the evidence is undisputed that it did, the contract expressly permitted defendant to exercise its option to terminate.

## VI. CONCLUSION

For the reasons set forth above, this Court finds that defendant's termination of the lease was in accord with the early termination provision of Article XXVI of the lease. Accordingly, this Court will grant summary judgment to the defendant on all six of plaintiff's claims concerning that early termination. An order will be entered forthwith in accordance with this opinion.